844 A.2d 487

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JOHN CHEW, DEFENDANT–APPELLANT.

Argued September 23, 2003—Decided March 25, 2004.

190

Edward A. Jerejian and Rita T. Jerejian, Designated Counsel, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney).

Nancy A. Hulett, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General of New Jersey, attorney).

Justice WALLACE delivered the opinion of the Court.

In this capital case, defendant John Chew appeals from the denial of his petition for post-conviction relief (PCR). This Court previously affirmed defendant's capital murder conviction and death sentence, State v. Chew, 150 N.J. 30, 695 A.2d 1301 (1997) (Chew I ), and determined that his sentence was not disproportionate when compared to similar cases, State v. Chew, 159 N.J. 183, 731 A.2d 1070 (1999) (Chew II ). Defendant asserted in his petition for PCR, among other things, the ineffective assistance of counsel during both the guilt and penalty phases of the trial. Defendant now appeals the trial court's denial of his petition for PCR. We reverse and remand for a new penalty phase trial.

## I

### A. Facts

The facts are set forth in detail in Chew I, supra, 150 N.J. at 42–50, 695 A.2d 1301. We repeat here those facts relevant to defendant's PCR petition and necessary to our disposition.

On January 13, 1993, police found the body of Theresa Bowman in defendant's car, which was parked in the rear of the Woodbridge Hilton Hotel parking lot. Bowman's throat was slashed and she had been dead for approximately ten hours. A piece of paper was found on Bowman with the name "Joe Martin" and a phone number written on it.

The police interviewed Alejandro Mecalco, a chef at the Hilton, who recalled seeing a man and woman struggling in the car when he left the hotel on the night of January 12, 1993. He described the man as looking like Kenny Rogers, a contemporary recording artist, with a round face, dark eyes, full beard, mustache, and neat, well-combed hair.

After the police determined that defendant owned the car, they contacted and arranged to meet with him at his home. Defendant appeared unkempt and did not match the description provided by Mecalco. Defendant spoke with the police for about fifteen minutes, providing them with his first statement (first statement).[1] He said he last saw Bowman on the evening of January 12, 1993, when they drove together to the home of his sister, Crystal Charette. Later, Bowman departed alone in defendant's car while he remained at Charette's house with Charette and her roommate, Helen Borden, for an hour-and-a-half before the two women drove him home. Police officers then interviewed Charette and Borden, who corroborated defendant's first statement.

On January 14, 1993, Detective Geoffrey Kerwin visited defendant's home to request an interview, obtain blood samples, and search his car and house. Defendant signed a waiver of his rights and agreed to the interview (second statement), and the search of his home. In his second statement, which was recorded, defendant repeated much of his first statement and provided more information about his relationship with Bowman. He said they met in 1988 and lived together from 1989 until the time of her death. After searching defendant's house, investigators took defendant to Charette's home, where Charette and Bowman gave taped statements exculpating defendant.

On January 15, 1993, the police received several telephone tips implicating defendant in Bowman's death. Defendant's life insurance agent, who sold a joint $250,000 life insurance policy to defendant and Bowman in 1991, reported that defendant, who was

---

[1] The trial court suppressed Chew's first statement.

the beneficiary of the policy if Bowman died first, arrived at the agent's house on December 31, 1992, thirteen days before the murder, to pay the December premium in cash because his check previously had bounced. Defendant told the agent he did not want the policy to lapse. Another call came from George Tilton, an associate of defendant, who reported that on several occasions between June and November 1991, defendant offered him $10,000 to kill Bowman so defendant could collect the insurance proceeds. Defendant's son, Robert Chew, also called the police and reported defendant's plan to kill Bowman and collect the insurance proceeds.

Randy F., Bowman's paramour, informed the police that Bowman planned to leave defendant and move in with Randy F. on January 13, 1993. He stated that Bowman told him defendant would receive a settlement check that date and she in turn would receive $10,000 from defendant.

On January 23, 1993, Detective Kerwin arrested defendant at his home. Other police investigators went to Charette's house. This time, Charette told a different story. She stated that defendant called her on the night of the murder and asked her to meet him at the Hilton and to bring a bag, bleach, and a change of clothes. Defendant told her that Bowman had picked up her paycheck and wanted to remain there with friends, but he wanted to return home. Charette and Borden arrived at the Hilton at 9:20 p.m. and approached defendant's car. Charette observed defendant exit his car with blood on his clothing. He then removed and placed his outer clothes in a bag, and instructed Borden to pour bleach in the bag. After he dumped the bag of clothes in a dumpster, Charette drove him home. Later that night, defendant coached her on what to tell the police and threatened her. Borden confirmed Charette's story and added that she thought she heard a scream shortly before defendant exited his car.

Detective Kerwin confronted defendant with Charette and Borden's statements. He administered *Miranda* warnings to defen-

dant. Defendant refused to sign the *Miranda* card, but agreed to give a taped statement (third statement). He then acknowledged being at the scene of the crime and having his sister and Borden drive him home. After the taped statement concluded, defendant provided a more detailed version of events (fourth statement). He claimed he went to the Hilton with Bowman to conduct a drug deal with a man named Joe, who he did not know. After he waited inside the hotel while Bowman met with Joe, defendant returned to the car to find Bowman dead. The interview terminated after defendant stated he wanted to contact his attorney.

The police charged defendant with murder around 4:00 p.m. Defendant complained of back pain and received medication. About two hours later, defendant asked to speak with Detective Kerwin. Tearfully, defendant asked the detective what penalty he faced, and after Detective Kerwin responded thirty years, defendant agreed to talk again. He recounted Bowman's drug deal with Joe. After the transaction, defendant entered the car and spoke to Bowman. She told him that she had "got[ten] ripped off" in the drug deal, and they began to quarrel. Defendant explained that after Bowman informed him about her affair with Randy F., he "went off" on her.

At that point, Detective Kerwin called in another detective, administered additional *Miranda* warnings, and defendant signed a waiver. Between 6:13 and 6:24 p.m., defendant provided another statement (fifth statement).

Defendant repeated his prior statement regarding the quarrel with Bowman following the failed drug deal. He claimed that Bowman hit him a couple of times and scratched him in the face. He did not remember stabbing her. After the argument, defendant left his vehicle and entered Charette's car. He claimed he asked her to pick him up because he and Bowman planned to separate after the drug deal. He intended to give Bowman a portion of the $25,000 expected from the drug deal. Defendant recalled removing and disposing of his bloodied clothes and beg-

ging Charette and Borden not to tell the police, but did not remember having stabbed Bowman.

### B. *Procedural History*

Defendant was indicted for purposeful or knowing murder by his own conduct, possession of a knife for an unlawful purpose, terroristic threats, and other offenses later dismissed by the trial court. The prosecutor served notice of one aggravating factor: that defendant killed Bowman "as consideration for the receipt, or in expectation of the receipt of anything of pecuniary value." *N.J.S.A.* 2C:11–3c(4)(d).

On June 13, 1995, the jury found defendant guilty of purposeful or knowing murder by his own conduct, *N.J.S.A.* 2C:11–3a(1) or (2), and possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4d. At the penalty phase trial, the jury found the aggravating factor that defendant murdered Bowman "in expectation of the receipt of anything of pecuniary value," *N.J.S.A.* 2C:11–3c(4)(d). The jury also found the ten mitigating factors raised by defendant under the catch-all mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h). The jury unanimously determined that the single aggravating factor outweighed all of the mitigating factors, and returned a death penalty verdict. After merger, the trial court sentenced defendant to death.

Defendant appealed directly to this Court as of right, *R.* 2:2–1(a)(3), and the Court affirmed his conviction and sentence, *Chew I, supra,* 150 *N.J.* at 88, 695 *A.*2d 1301, while preserving his request for proportionality review, *ibid.; see N.J.S.A.* 2C:11–3e. In *Chew II,* the Court determined that defendant failed to show his death sentence was disproportionate. *Chew II, supra,* 159 *N.J.* at 226, 731 *A.*2d 1070. The United States Supreme Court denied defendant's petition for certiorari. *Chew v. New Jersey,* 528 *U.S.* 1052, 120 *S.Ct.* 593, 145 *L.Ed.*2d 493 (1999).

### C. *The Petition and Hearing for Post–Conviction Relief*

In June 2000, defendant filed a petition for PCR alleging he had been denied the effective assistance of counsel at both the guilt

and the penalty phases of his trial. With respect to the guilt phase, defendant claimed his trial counsel were deficient for pursuing a denial defense instead of a passion/provocation manslaughter defense, and for failing to request a general accomplice charge. With respect to the penalty phase, defendant claimed his trial counsel were deficient for failing to: (1) use Dr. Gerald Cooke, a psychologist, as an expert witness in support of the mitigating factor under *N.J.S.A.* 2C:11-3c(5)(a); (2) present evidence in support of the mitigating factor under *N.J.S.A.* 2C:11-3c(5)(b); (3) present evidence to show that defendant had no history of violent crimes; and (4) request a limiting instruction.

A hearing was held on defendant's petition. Both trial counsel testified. Terrance Toner, Esquire, a former Middlesex County Assistant Prosecutor, who had participated in approximately twenty criminal-defense trials, was primarily responsible for handling the guilt phase at trial. Pamela Brause, Esquire, was assigned to assist Toner and primarily handled the penalty phase of the trial. Brause previously had represented other defendants in murder trials, but this was her first capital case.

Toner recalled that defendant said he was taking medication at the time he gave his January 23, 1993, statements to the police. As a result, Toner decided to explore the possibility of attacking the admissibility of those statements based on the medication. To develop that defense, Toner hired Dr. Robert J. Pandina. Two months later, Toner received a copy of a report from the State's expert, Dr. Reng Lang Lin, who reported that he found no trace of alcohol or drugs in defendant's blood sample taken on January 14, 1993. Toner gave Dr. Lin's report to Dr. Pandina to review. Dr. Pandina subsequently informed Toner that Dr. Lin's report was contrary to what defendant had informed him. Thus, Dr. Pandina refused to testify on defendant's behalf because he questioned defendant's credibility.

Based on a police report regarding the quantity of medication defendant received while in custody, Toner changed tactics and argued that the police wrongfully withheld defendant's medi-

cations. He decided to use Dr. Lin's report, which found no trace of alcohol or drugs in defendant's blood, to attack the credibility of Charette and Borden, who told police that they had smoked marijuana with defendant on January 12, 1993.

Toner and Brause also developed a defense strategy concerning the phone number with the name "Joe Martin" found written on a piece of paper in Bowman's pocket. Toner tried to call the number and discovered it was disconnected. Because the prosecutor's report indicated that Detective Kerwin investigated the incorrect phone number, Toner questioned the thoroughness of the police investigation. Toner, however, conducted no further investigation of Joe Martin or the phone number because he believed the information he had gathered namely, that the number had been disconnected comported with the defense theory that someone else murdered Bowman.

Toner and Brause decided to pursue a denial defense. They based their decision on Dr. Lin's report, the State's investigation of the wrong phone number, and Mecalco's statement that he saw a man who looked nothing like defendant struggling with Bowman. Toner explained they did not pursue a passion/provocation defense because: "[T]o go with passion/provocation manslaughter, we would have had to tell the jury that he did it, he killed this girl." He and Brause viewed the two defenses as mutually exclusive: "[W]e couldn't really say that it wasn't Mr. Chew, but if it was, he was upset." Toner also stated that the State's evidence that defendant planned to kill Bowman for the insurance proceeds undermined a manslaughter defense.

Toner recalled that shortly before the trial was scheduled to begin, the prosecutor informed him that Dr. Lin's conclusions in his report related solely to the twenty-four hour period before the blood was extracted. Hence, because defendant's blood was drawn on January 14, 1993, the absence of narcotics related back to January 13, 1993, the date Bowman's body was discovered. Toner had not questioned Dr. Lin concerning his report and did not recall having defendant's blood tested independently. He

realized that this information neutralized part of his contemplated avenue of cross-examination.

Toner recollected that after jury selection the prosecutor had informed him that detectives discovered that the phone number had been disconnected in August 1992. Toner immediately sought postponement of the trial, but his request was denied. Toner explained that if he had known earlier about the phone number being disconnected in the summer of 1992, he would have altered his argument slightly to eliminate any significance to that evidence.

Toner testified there were many reasons for pursuing a denial defense. He did not concede the defense would have been different had he known before trial about the disconnected phone number and the time limitation on Dr. Lin's toxicology results. He stressed that Mecalco was an independent witness who saw a man in defendant's car who looked nothing like defendant. Toner explained that the strategic advantage of that independent witness played a major role in his tactical decision to proceed with a denial defense. Toner wanted the defense to stand on its own, meaning either defendant did or did not commit the murder. A passion/provocation manslaughter defense would have required defendant to admit guilt. Although Toner acknowledged he could have pursued more than one defense, he claimed that doing so would have required him to minimize the weight of the State's most damaging evidence on defendant's pre-meditation. He reasoned that it would not have been wise to argue to the jury that defendant was impassioned when he slit Bowman's throat.

Toner explained that he considered all the evidence when he contemplated and chose defendant's defense. He noted that he discussed the defense with defendant "many times," and defendant agreed with a denial defense. All discovery was provided to defendant, and Toner reviewed it with him at least once a week. Although Toner did not recall whether he discussed the possibility of asserting a passion/provocation defense with defendant, he did

note that he had asked for and received a passion/provocation manslaughter charge during the guilt phase of the trial.

Beth Kelly, the defense investigator, testified that in June 1994, she contacted the pager company that issued the phone number found in Bowman's pocket. She learned the number was disconnected in August 1992. Kelly was sure she discussed this information with Toner. Kelly also interviewed defendant's friend, Lisa Paturzzio, who said she visited defendant's home in January 1993 and saw Bowman handling cocaine.

Paturzzio also testified at the hearing. She recalled seeing a lot of cocaine in the kitchen of defendant's home in January 1993. She was informed that defendant and Bowman expected to sell the cocaine to a man named Joe for $25,000. Paturzzio recalled talking to Kelly and defendant's lawyer. She admitted visiting defendant in jail several times before the trial began in 1995. Around the time of the trial, she received a telephone call and was informed she would not be called as a witness, because it would be difficult to corroborate her story of seeing drugs in defendant's home.

Brause testified she had explored the argument that medications that were needed by defendant were withheld from him at the time he gave his January 23, 1993, statements to police. In addition, she investigated the possibility of obtaining an independent testing of defendant's blood to determine whether he was intoxicated at the time of the attack. Brause met with Dr. Lin, who told her that narcotics remain in the bloodstream for twenty-four hours. Later, she met with Dr. Pandina, who informed her that marijuana could remain in the bloodstream for up to thirty days. Brause claimed she and Toner had relied on Dr. Lin's report in devising their strategy. Consequently, she requested an adjournment once she realized Dr. Lin's conclusions only pertained to a twenty-four hour period prior to the day defendant's blood was taken. She felt that "the blood issue" was under-investigated and that Dr. Lin's report should have been provided to Dr. Pandina prior to the completion of his report.

Brause never understood why Toner thought the phone number was important. She believed defendant had no real viable defense at the guilt phase because the State's evidence was overwhelming. In preparation for the possibility of a penalty phase trial, Brause retained Dr. Cooke to conduct a psychological-intellectual-organic screening of defendant and to "assess" any mitigating psychological factors.

Brause learned from Charette that she had an incestuous relationship with defendant. Brause was aware that the State's mental health expert, Dr. Daniel Greenfield, had interviewed Charette. Although Brause never asked Charette whether she informed Dr. Greenfield about the incestuous relationship, Brause "believed" Charette had done so. Brause never requested a copy of Dr. Greenfield's report, if any, nor did she recall asking Dr. Cooke if the incestuous relationship would have altered his opinion. Brause decided not to call Dr. Cooke as a witness at the penalty phase for fear the incestuous relationship would be revealed to the jury.

On cross-examination, Brause outlined the reasons why she elected not to call Dr. Cooke as a witness at the penalty phase: (1) she did not want Dr. Greenfield to examine defendant, because she was "sure" the doctor would diagnose him a sociopath and thus expose defendant's anti-social and criminal behavior; and (2) she feared Dr. Greenfield knew of the incestuous relationship and would reveal that and other damaging information to the jury. Brause explained that there had been allegations that as a child, defendant had harmed animals and molested a young neighbor. She explained that she did not want Dr. Greenfield to have an opportunity to discuss those acts and defendant's incest with Charette because she felt the jurors might become upset with this kind of behavior and be more death-prone.

Jacqueline Turner, a deputy public defender, who assisted Brause on legal issues during the trial and who represented defendant in his direct appeal, testified that she talked with Brause about requesting an accomplice liability charge. Turner assumed Brause understood that the accomplice charge should be

included as part of the murder charge. After Brause informed her that the trial court refused to give an accomplice liability charge, Turner advised Brause to at least try to have the accomplice liability charge "somewhere" in the jury instructions.

Lois Nardone, a social worker who testified for the defense at the penalty phase trial, described defendant's family background of chaos, violence, sexual abuse, sexual promiscuity, beatings, excessive drinking, and lack of love and support. Nardone also testified at trial concerning defendant's juvenile and adult criminal history. She recounted defendant's juvenile arrests and juvenile convictions for various acts of breaking and entering, larceny, forgery, writing bad checks, thefts and drug possession. Nardone further testified that defendant's brother, Robert Chew, had been convicted of assault and rape. Nardone claimed that if she were investigating defendant's case anew, she would seek to show his prior crimes were all non-violent.

Dr. Cooke outlined his diagnoses of defendant as: (1) personality disorder (NOS), mixed with dependent, histrionic, and antisocial features; (2) drug dependency; (3) depressive disorder; and (4) developmental reading disability. He believed there was support for the mitigating factor under *N.J.S.A.* 2C:11–3c(5)(a), that "defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." He stated that Brause never told him about the incestuous relationship between defendant and Charette nor asked him whether that relationship would have changed his diagnosis. Dr. Cooke explained he was aware that an aunt had sexually abused defendant as a child and that there was general sexual promiscuity within the family. However, he was unaware of the allegations that defendant, as a child, engaged in cruelty to animals and molested a young boy. Dr. Cooke claimed that that information would have strengthened his conclusions because it documented an even greater depth of pathology than he had been aware of previously.

On cross-examination, Dr. Cooke acknowledged that defendant exhibited signs of potential violence as a child, such as setting his

grandmother's house on fire and cruelty to animals. Dr. Cooke also acknowledged that defendant fit several of the criteria for anti-social personality disorder, including "conduct disorder" before the age of fifteen, failure to conform to society's norms as an adult, a pattern of deceit evidenced by defendant's convictions, which implied "conning" on his part, and financial irresponsibility, evidenced by defendant's buying drugs. Dr. Cooke conceded that defendant met the minimum requirement of three criteria under the Diagnostic Statistic Manual (DSM) for anti-social personality disorder. He explained that at the time he examined defendant in 1995, the DSM required that six or seven out of fifteen criteria be met for a diagnosis of anti-social personality disorder.

Following the PCR hearing, the PCR court requested written submissions. Later, the PCR court rendered a written decision that focused on the three issues raised by defendant in support of his ineffective assistance of counsel claims: (1) a denial defense should not have been used, but rather, a passion/provocation manslaughter defense should have been developed; (2) counsel should have requested a general accomplice charge; and (3) counsel failed to call Dr. Cooke to establish the mitigating factor under *N.J.S.A.* 2C:11–3c(5)(a). The PCR court concluded that while there may have been some deficiencies in the trial preparation by defense counsel, the defense team made a strategic decision to employ a denial defense, there was no deficiency in failing to request a general accomplice charge, and whatever the positive effects of finding the mitigating factor under *N.J.S.A.* 2C:11–3c(5)(a) might have been if Dr. Cooke had testified, they would have been nullified by the negative features of such testimony.

Defendant appeals to this Court as of right. *R.* 2:2–1(a)(3).

## II.

### *Standard of Review*

This Court has often reiterated the principles concerning review of claims alleging ineffective assistance of counsel. In

*State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987), the Court adopted the standard for evaluating ineffective assistance of counsel claims enunciated by the United States Supreme Court in *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). The *Strickland* Court created a two-prong test for evaluating claims of ineffective assistance of counsel. A reviewing court first must determine whether counsel's performance "fell below an objective standard of reasonableness," *Strickland, supra,* 466 *U.S.* at 688, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693, and second, whether there exists a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698.

The first prong is satisfied by a showing that counsel's acts or omissions fell "outside the wide range of professionally competent assistance" considered in light of all the circumstances of the case. *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. Therefore, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694. To rebut that presumption, a defendant must establish that trial counsel's actions did not equate to "sound trial strategy." *Ibid.,* 104 *S.Ct.* at 2065, 80 *L.Ed.*2d at 694–95 (quoting *Michel v. Louisiana,* 350 *U.S.* 91, 101, 76 *S.Ct.* 158, 163–64, 100 *L.Ed.* 83, 93 (1955)). In evaluating a defendant's claim, the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of the attorney's conduct." *Id.* at 690, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695.

The second prong is satisfied by a defendant showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Id.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698. The error committed must be so serious as to undermine the court's confidence in the jury's verdict or result reached. *Ibid.*

The *Strickland* standard applies, with some adjustment, to capital trials. *State v. Davis,* 116 *N.J.* 341, 356–57, 561 *A.*2d 1082 (1989). Regarding both phases of capital trials, the standards for reasonable performance, incorporated into the deficiency prong analysis are applied with regard to the unique aspects of capital litigation.

> Capital defendants are guaranteed competent capital counsel. Obviously the measure of an advocate's competency depends on the task to be accomplished. The best intentions and the most devoted of efforts do not necessarily equate with capital competence. We expect capital defense counsel to have an expertise regarding the special considerations present in capital cases. The *Strickland/Fritz* standard demands no less.
>
> [*Id.* at 356, 561 *A.*2d 1082.]

While the prejudice prong analysis normally conducted under *Strickland* applies to a defendant's guilt phase representation, a less demanding prejudice-prong standard is used for the penalty phase. In *State v. Marshall,* 148 *N.J.* 89, 690 *A.*2d 1, (*Marshall III* ), *cert. denied,* 522 *U.S.* 850, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997), the Court recognized the "unique circumstances of a capital case penalty phase proceeding," *id.* at 248, 690 *A.*2d 1, and concluded the "prejudice prong" should be amended, *id.* at 248–50, 690 *A.*2d 1. The Court held that a capital defendant demonstrates prejudice on a showing of "a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty phase deliberations *would have been affected substantially.*" *Id.* at 250, 690 *A.*2d 1 (emphasis added). The Court explained:

> [A] reviewing court strays from its traditional functions if it attempts to predict the probability that a penalty-phase jury would have changed its verdict if counsel had not been deficient. In our view, an adaptation of the *Strickland/Fritz* prejudice test to capital-case penalty-phase proceedings that more faithfully reflects our appellate function would require courts to determine *whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially* .... We regard our understanding of the *Strickland/Fritz* prejudice prong for reviewing claims of ineffective assistance of counsel in penalty-phase proceedings to be a necessary adaptation of

the literal *Strickland* standard to the realistic limitations on appellate review of jury penalty-phase deliberations.

[*Ibid.* (emphasis added).]

The Court noted that the reformulation of the prejudice prong was consistent with "the *Strickland* Court's admonition that a 'reasonable probability that the result of the proceeding would have been different' is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* at 250, 690 *A.*2d 1 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698); *see State v. DiFrisco,* 174 *N.J.* 195, 220, 804 *A.*2d 507 (2002) (noting "the relevant inquiry under the prejudice prong is whether defendant's argument in respect of mitigation, as well as his other asserted errors, undermines the Court's confidence in the outcome of the penalty-phase deliberations").

In assessing the reasonableness of counsel's assistance, a reviewing court must assess the performance of counsel with " 'a heavy measure of deference to counsel's judgments.'" *State v. Martini,* 160 *N.J.* 248, 266, 734 *A.*2d 257 (1999) (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Therefore, where "reasonable professional judgments" support a defense counsel's decision to limit an investigation, the court should not find ineffective performance of counsel. *Ibid.* (citing *Burger v. Kemp,* 483 *U.S.* 776, 794, 107 *S.Ct.* 3114, 3125, 97 *L.Ed.*2d 638, 657 (1987)). Nevertheless, "strategy decisions made after less than complete investigation are subject to closer scrutiny." *State v. Savage,* 120 *N.J.* 594, 617–18, 577 *A.*2d 455 (1990). This Court previously has explained:

If counsel thoroughly investigates [the] law and facts, considering all possible options, his or her trial strategy is 'virtually unchallengeable.' ... Indeed, counsel has a duty to make 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' A failure to do so will render the lawyer's performance deficient.

[*Id.* at 617–18, 577 *A.*2d 455 (citations omitted); *see also Davis, supra,* 116 *N.J.* at 357, 561 *A.*2d 1082; *State v. Russo,* 333 *N.J.Super.* 119, 138–39, 754 *A.*2d 623 (App.Div.2000).]

### III.

### *Ineffective Assistance of Counsel in the Guilt Phase*
#### A. *Decision to Pursue a Denial Defense*

Defendant argues that he received ineffective assistance of counsel when trial counsel based their decision to pursue a denial defense on inadequate investigation and made the decision without consulting him. He contends that trial counsel were deficient in failing to investigate two crucial pieces of evidence, the phone number found in Bowman's pocket and the report by Dr. Lin stating that no alcohol or drugs were found in a blood sample taken from defendant on January 14, 1993. He asserts that as a result of that deficiency, he was prejudiced at both the guilt and penalty phases of his trial because there exists a reasonable probability that a passion/provocation manslaughter defense would have achieved a different result. Further, he argues that the failure of trial counsel to undertake an investigation requires the reviewing court to closely scrutinize counsels' conduct, which should result in a finding of ineffective assistance of trial counsel.

Regarding the phone number, defendant asserts that the investigation was inadequate because counsel relied on the State's report, which showed that the police investigated the wrong number, instead of investigating the report submitted by Investigator Kelly. He contends that counsel justified their limited investigation by stating they had no obligation to help the State make its case.

In regards to Dr. Lin's report, defendant asserts that the investigation was inadequate because counsel failed to consult with another expert or to conduct an independent test of defendant's blood. Defendant also notes that at the PCR hearing, Brause admitted that she and Toner "under-investigated" Dr. Lin's report.

Defendant claims that Toner's and Brause's testimonies at the PCR hearing demonstrate that the phone number and blood work were central to his defense and not collateral issues. He also

notes that when his counsel requested an adjournment, the trial court criticized counsels' investigation, stating: "If your whole defense hinged on this [the phone number], why didn't you check it out closer than you did?" Toner replied that he had no obligation to correct the State's mistake. The trial court denied the request and remarked that if you don't confirm the mistake and investigate, "you run into these kinds of problems."

With respect to the prejudice prong of the *Strickland* standard, defendant argues that trial counsels' decision to proceed with a denial defense prejudiced him. He contends that there was a rational basis for the passion/provocation defense, and that his counsel failed to investigate thoroughly the strength of such a defense as well as the weakness of the denial defense. Defendant asserts that his confession essentially nullified a denial defense, but supported a passion/provocation defense. He argues that if trial counsel had used Dr. Cooke's report and the evidence of defendant's statements, there would have been a reasonable probability that the guilt phase jury would not have convicted him of knowing and purposeful murder by his own conduct.

Further, defendant argues that the denial defense was inconsistent with counsels' mitigating strategy of humanizing defendant in the penalty phase trial and rendered suspect the argument he was remorseful. Defendant claims that the denial defense directly conflicted with the pecuniary gain aggravating factor and prejudiced him by preventing one juror from deciding he killed Bowman, not for money, but in response to the emotional trauma of Bowman leaving him for another man.

Finally, defendant cites a California study, which found that juries were significantly more likely to impose a death penalty in cases where defendant raised a denial defense as compared to cases where defendant raised an admission defense. *See* Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse and The Death Penalty*, 83 Cornell L.Rev. 1557, 1574–75 (1998).

The State counters that trial counsel made a reasonable decision to pursue a denial defense based on evidence other than the phone number and the toxicology report. The State contends that trial counsel conducted a vigorous defense that was the product of legitimate, tactical decisions. The State points to trial counsels' use of Mecalco as their main witness to challenge guilt because Mecalco was an independent witness who claimed to have seen a man in defendant's car who resembled Kenny Rogers.

The State notes that trial counsel pursued an independent investigation and accumulated a host of witnesses to support the denial defense, including Mecalco, Peter DeForest, Charette's daughter, the insurance agent, and defendant's brother. The State also refers to trial counsels' additional evidence in support of a denial defense that included defendant's statement about a drug deal gone awry, the absence of physical evidence linking defendant to the crime scene, and cross-examination of the State's witnesses that exposed inconsistencies and biases.

Further, the State argues that defendant's claim of "potent" evidence to support the passion/provocation defense was illusory and supported by only defendant's January 23, 1993, statement. The State adds that the horrific nature of the crime, combined with the State's evidence of financial motive and premeditation, undercut the viability of a passion/provocation defense and revealed the rationality of counsels' strategic decision to mount a denial defense.

The State also argues that trial counsels' investigation was incomplete only on collateral evidence that supported defendant's claim of a drug deal gone awry because the phone number and the toxicology report were not pivotal to the defense. Even though the phone number was invalid in January 1993, trial counsel were still able to use the evidence to argue that Bowman was involved in a botched drug deal in the Hilton parking lot and that police were deficient in taking more than a year to check out the phone number.

The State attempts to distinguish *Savage* by noting that "numerous facts" in *Savage* indicated the importance of pursuing a psychiatric defense and therefore the incomplete investigation involved the core of the defense. The State asserts it was in that context the Court ruled that strategic decisions made after less than a complete investigation will be subjected to closer scrutiny. *See Savage, supra,* 120 *N.J.* at 617–18, 577 *A.*2d 455. The State argues that in contrast, the investigation in this case pertained to collateral evidence not pivotal to the defense. Thus, closer scrutiny of counsels' tactical decisions is unnecessary.

Finally, the State notes that trial counsel advocated a denial defense, but successfully obtained a lesser-included instruction including passion/provocation manslaughter. The State contends that the acquittal strategy, with the secondary goal of getting a lesser conviction, if successful, would have saved defendant's life.

As noted, the PCR court rejected defendant's argument that counsel rendered ineffective assistance of counsel by pursuing a denial defense. The PCR court discussed the two defense theories available to counsel—denial and passion/provocation—and concluded that both strategies had advantages and disadvantages: "Passion/provocation admitted the murder and risked the jury not accepting Chew's statement to the police. Denial risked the jury not accepting the testimony of an independent eye witness, who, if believed, would have caused an acquittal." Recognizing that it was not called upon to determine which defense was "more viable," the PCR court concluded that the decision "was one purely of strategy where defendant had input."

With respect to the deficiency of the investigation argument, the PCR court found that "the defense could have been better prepared" on the toxicology and phone number issues but that the "somewhat deficient" performance did not meet the level of incompetence required by the first prong of the *Strickland/Fritz* test. Furthermore, because the "main thrust" of the defense case was that a Kenny Rogers look-alike killed Bowman, the court deter-

mined that the investigations of the phone number and Dr. Lin's reports were "very collateral" to the defense theory of the case.

It is obvious that defense counsel "has a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary." *Martini, supra,* 160 *N.J.* at 266, 734 *A.*2d 257 (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695). Here, after discovering the potential conflicts between Dr. Lin's report and Dr. Pandina's report, defense counsel abandoned further investigation of the role of defendant's drug use and decided to change course to argue that defendant was under-medicated at the time of his confessions. Counsel should have realized that the two reports were neither contradictory nor mutually exclusive. Further, counsel could have interviewed Dr. Lin about his report after it was issued, which would have avoided the eventual surprise that Dr. Lin's report only reflected ingestion of drugs and alcohol for a twenty-four hour period before defendant was tested on January 14, 1993.

The relevance, if any, of the phone number is less clear. Toner testified at the PCR hearing that he anticipated using the State's investigation of the wrong phone number to plant doubt in the juror's minds about the completeness of the State's case. That is, the number itself was relevant only because the State investigated the wrong number. Once the State revealed that its subsequent investigation of the correct number disclosed it was not a working number at the time of the incident, the number ceased to matter at all. Consequently, while defense counsels' investigation of the number could have been more thorough, the phone number played little or no part in counsels' decisions at trial.

The salient question is whether the decision to argue a denial defense flowed from those investigations. If it did not, then any deficiencies in defense counsels' investigations would not have influenced the decision to employ a denial defense.

At the PCR hearing, Toner gave the following reason for pursuing a denial defense:

> The [reason] that jumps out is the independent witness, Alexandro Mecalco, he was a cook or a helper, kitchen aid with the Hilton Hotel, and I believe his statement indicated that ... he had observed an individual in the car right at the time of the murder with Mrs. Bowman, and he described that individual, and that's where the Kenny Rogers comparison came in. I think we even ... hired a sketch artist, and we had a sketch drawn up based on his description, and it looked nothing like Mr. Chew, and that was major. I mean the quality of witnesses in this case for the State, I viewed, or it was my opinion, between all the drugs that were being taken by everybody, all the inconsistencies, this Alexandro Mecalco shined through as the only independent witness in the case, and I felt that him seeing, Mr. Mecalco pointing out, that there was somebody in the car that didn't look anything like my client, [that] played a pretty big part in the decision to go with a denial defense.

The PCR court found Toner to be credible. Further, while the court criticized defense counsels' investigation of Dr. Lin's toxicology report and the phone number, it found that the decision to pursue a denial defense was reasonable trial strategy.

This Court is convinced there was sufficient credible evidence for the PCR court to conclude that the decision to pursue a denial defense was based largely on Mecalco's eyewitness testimony that he saw a person resembling Kenny Rogers leave the car where Bowman's body was subsequently found. Despite the inadequate investigation into minor collateral issues, the decision to pursue a denial defense did not constitute deficient performance because it was reasonable in light of the eye-witness's account.

Defendant further contends that his counsel should have pursued a passion/provocation manslaughter defense because under the best-case scenario, the jury would have believed that defendant and Bowman had argued after Bowman got "ripped off" in the drug transaction, but that defendant had reacted violently because she told him she was leaving to live with another man. Under those circumstances, he argues that the jury would have convicted him of manslaughter, and that he would not have been eligible for a death sentence. Alternatively, defendant asserts that even if the jury had convicted him of knowing and purposeful murder by his own conduct, the passion/provocation defense would have carried over to the sentencing phase and dovetailed with a

mitigation presentation of defendant's remorse. He postures that the jury would have rejected the aggravating factor that defendant killed Bowman to recover the life insurance proceeds, and that he would have been sentenced to life.

To be sure, the actual outcome of a passion/provocation defense is highly speculative. The weakness of defendant's argument regarding prejudice is that a passion/provocation defense would have been hampered by extensive evidence of defendant's premeditation. Defendant's son, Robert, testified that defendant told him about the life insurance policy and his plan to kill Bowman for the proceeds, that defendant took out a joint policy to deflect suspicion that he purchased the insurance with murder in mind, and that defendant suggested several murder scenarios to Robert, one of which was to make the murder look like a drug deal gone awry. Further, Tilton, an associate of defendant, testified that between June and November 1991, defendant repeatedly offered him $10,000 to kill Bowman. Defendant told Tilton that he would pay him from the life insurance proceeds he would receive after the murder. Additionally, the insurance agent testified that defendant came to his house on New Year's Eve, 1992, twelve days before the murder, to pay the overdue balance on the life insurance policy.

Thus, both the denial and passion/provocation defenses carried benefits and drawbacks. Defendant's confession and other evidence of premeditation undercut the denial defense, while Mecalco's testimony, if believed, could have exonerated him. The passion/provocation defense accommodated defendant's statements to the police, and if rejected in the guilt phase, would have been consistent in the penalty phase with the mitigating evidence of defendant's remorse. Yet, that defense ran the risk of the jury rejecting defendant's explanation at both the guilt and penalty phases in light of the evidence of premeditation and financial gain. In short, defense counsel had to choose between two weak defenses, and selected the denial defense over passion/provocation while still seeking and receiving a lesser-included charge on pas-

sion/provocation. This Court will not second-guess counsels' trial strategy in that regard. *See State v. Bey,* 161 *N.J.* 233, 251, 736 *A.*2d 469 (1999)(citing *Marshall III, supra,* 148 *N.J.* at 156–57, 690 *A.*2d 1), *cert. denied,* 530 *U.S.* 1245, 120 *S.Ct.* 2693, 147 *L.Ed.*2d 964 (2000).

## B. *Defense Counsels' Failure to Request a General Accomplice Charge*

Defendant next argues that defense counsel were ineffective at his guilt phase trial for failing to obtain an accomplice liability instruction. At trial, defense counsel immediately requested an accomplice liability charge, but ultimately withdrew the request and asked the court to give it during the "own-conduct" portion of the charge. The prosecutor argued that no grounds existed for including an accomplice charge and that defense counsel neither argued nor presented evidence to support a theory that defendant acted with another person to kill Bowman. The trial court agreed and denied the request.

After the trial court delivered its charge, defense counsel renewed its objection, again asking the court to define accomplice for the jury. The trial court again denied the request, stating there was no evidence to sustain the "vague" theories proffered by the defense.

On direct appeal, defendant argued that the trial court erred in denying defendant's requests that a definition of the term "accomplice" be included in the court's own-conduct charge. The Court rejected that claim, stating:

Defense counsel did not wish to expose her client to a conviction of murder as an accomplice. Had Chew been an accomplice to the killing, there would have been no realistic way for the jury to return a manslaughter verdict. (The jury was charged on passion-provocation manslaughter.) Instead of seeking a charge on murder as an accomplice, defendant sought to read into the own-conduct definition the principles of vicarious liability.

[*Chew I, supra,* 150 *N.J.* at 73, 695 *A.*2d 1301.]

The Court found accomplice liability to be inapposite to the jury's deliberations on this issue because the own-conduct requirement is

"merely a triggering device" for the sentencing phase, *id.* at 74, 695 *A.*2d 1301 (quoting *State v. Gerald,* 113 *N.J.* 40, 99, 549 *A.*2d 792 (1988)), and it " 'is simply irrelevant to the question of whether defendant is guilty of purposeful or knowing murder,' " *ibid.* (quoting *Gerald, supra,* 113 *N.J.* at 100, 549 *A.*2d 792). Further, the Court noted that the trial court "was always prepared to give a straight accomplice charge," and that it was defense counsels' "request to incorporate the accomplice charge in the own-conduct charge that caused the problem." *Id.* at 75, 695 *A.*2d 1301. The Court held that it was proper for the trial court to refuse to include a charge of accomplice liability in the own-conduct portion of the jury instructions. *Id.* at 76, 695 *A.*2d 1301.

The Court also addressed whether the record at trial would have allowed for a general accomplice charge, finding that "[o]nly the most generous interpretation [of the evidence] would provide a rational basis for an accomplice charge." *Id.* at 76, 695 *A.*2d 1301. The Court concluded:

> Without barring a later ineffective assistance claim, we are satisfied that under the second prong of the *Strickland/Fritz* test there is not a reasonable probability that these deficiencies materially contributed to defendant's conviction.
>
> [*Ibid.* (citations omitted).]

Defendant asks this Court to reconsider it's conclusion because of the additional information provided at the PCR hearing that Charette said she "saw somebody with a long black trench coat in the area of the car." He argues that if that statement had been elicited at trial, it would have supported an accomplice charge. Defendant maintains that it is not necessary that defense theories and jury charges be consistent.

Defendant characterizes Brause's failure to request a general accomplice charge as an outgrowth of her inability to understand accomplice liability as it related to the jury charge. Defendant urges this instance of deficient performance led to the trial court's refusal to give an accomplice instruction. With regard to the prejudice prong, defendant argues that he was deprived of a jury instruction that was supported by the evidence, which prevented

him from receiving the benefit of a verdict that would have avoided the possibility of a death sentence.

The State relies substantially on the Court's conclusion in *Chew I, supra,* 150 *N.J.* at 76, 695 *A.*2d 1301, that no basis existed to convict him as an accomplice, and argues that defendant can show no prejudice under the second prong of *Strickland.*

The PCR court found no deficient performance in Brause's failure to request a general accomplice liability instruction. The PCR court rejected defendant's argument that Brause did not understand the law of accomplice liability, and found "no evidence" that defendant acted as an accomplice to support an accomplice charge.

 Despite the evidence presented at the PCR hearing concerning Brause's misunderstanding of Turner's instructions regarding a general accomplice liability charge, the evidence presented at trial did not support accomplice liability. Brause testified at the PCR hearing that she might have been confused by Turner's advice to seek an accomplice charge because the evidence did not support an accomplice finding. Although there was some evidence that defendant may have solicited someone else to kill Bowman, there was no evidence that any person agreed to help or helped defendant kill Bowman. Simply stated, there was no rational basis for an accomplice liability instruction. Therefore, the failure to request the charge was not prejudicial to defendant.

## IV.

### *Ineffective Assistance of Counsel in the Penalty Phase*

Defendant claims that defense counsel were ineffective in their decision not to call Dr. Cooke as a witness. Specifically, defendant argues that counsel failed to conduct an adequate investigation and their decision not to call Dr. Cooke prejudiced him because it kept important mitigating evidence from the jury. Defendant notes that *N.J.S.A.* 2C:11–3c(5)(a) allows evidence of

the mitigating factor that "defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." He asserts that Dr. Cooke was prepared to testify that he diagnosed defendant with "Personality Disorder mixed with Dependent and Antisocial Features." Defendant further claims that Dr. Cooke would have opined that defendant was "the product of an emotionally and culturally deprived childhood," and "suffered from serious mental and emotional disturbance since a young age." Thus, Dr. Cooke, consistent with his report, was prepared to testify that mitigating factor, *N.J.S.A.* 2C:11–3c(5)(a), existed in this case.

Defendant contends that counsels' investigation resulting in their decision not to call Dr. Cooke as a witness suffered three shortfalls. First, counsel accepted Charette's assertions about her incestuous relationship with defendant without investigating the allegations of Charette's mental and emotional instability. Second, counsel assumed Charette informed Dr. Greenfield about the incestuous relationship, but neither requested or obtained Dr. Greenfield's report nor interviewed him to determine whether their fear was substantiated. Third, counsel failed to discuss with Dr. Cooke the alleged incestuous relationship to determine whether he was aware of the allegation or if it would have altered his opinions.

The State counters that counsels' decision not to call Dr. Cooke was reasonable in light of the potentially devastating downside it would have if the jury were to receive the evidence concerning incest.

The PCR court found Dr. Cooke a credible witness, but found that whatever positive effects his testimony would have in support of mitigating factor *N.J.S.A.* 2C:11–3c(5)(a), would have been nullified by the negative features of such testimony. The PCR court concluded counsel were not deficient in this regard, but even if they were, defendant failed to satisfy the prejudice prong.

 "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. "A failure to do so will render the lawyer's performance deficient." *Savage, supra,* 120 *N.J.* at 618, 577 *A.*2d 455. In evaluating whether defense counsel has satisfied the duty to make reasonable investigations, the reviewing court must apply "a heavy measure of deference to counsel's judgments." *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. That is, if counsel makes a thorough investigation of the law and facts and considers all likely options, counsel's trial strategy is "virtually unchallengeable." *Id.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 695. However, if counsel fails to make a complete investigation, counsel's strategy decisions "are subject to closer scrutiny." *Savage, supra,* 120 *N.J.* at 618, 577 *A.*2d 455.

 Here, counsels' strategic decision not to call Dr. Cooke as an expert witness was not based on a thorough investigation of the facts and a consideration of all "plausible options." *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695. Once counsel became aware that Charette claimed to have had an incestuous relationship with defendant, they failed to investigate whether Dr. Greenfield was aware of this information. Counsel never interviewed Dr. Greenfield nor requested a copy of any report he might have prepared.[2]

---

[2] Subsequent to oral argument before this Court, defendant moved to supplement the record with Dr. Greenfield's report. The State did not oppose the motion, as long as the matter is remanded for a hearing regarding the circumstances of the report; *i.e.,* when it was turned over, whether counsel reviewed it, and if so, whether it affected their decision to call Dr. Cooke. Neither defendant nor the State explained why the report should be considered for the first time after oral argument. The report does not indicate that Dr. Greenfield was aware of defendant's incestuous relationship with Charette. In addition, the report does not classify defendant as a sociopath. Although Dr. Greenfield noted that defendant's antisocial personality and behavior have been a part of his character for years, he opined that the recent murder of Bowman was qualitatively

In addition, counsel failed to discuss this information with Dr. Cooke to determine whether an incestuous relationship would have changed his opinion. Dr. Cooke testified at the PCR hearing that he never was made aware of defendant's alleged incestuous relationship with his sister. He explained that such a revelation would have "strengthened" his conclusion that defendant was "under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." Dr. Cooke stated he was previously aware that defendant's aunt sexually abused defendant as a child and defendant lived in a sexually promiscuous environment. Even though Dr. Cooke was previously unaware of allegations that as a child defendant had committed cruelty to animals and had molested a young male neighbor, he testified that this additional information demonstrated an "even greater depth of pathology" than he had realized.

The failure of counsel to make a thorough investigation of these matters before deciding to limit the case in mitigation "rob[bed this] strategic choice of any presumption of competence." *Davis, supra,* 116 *N.J.* at 357, 561 *A.*2d 1082. Absent the presumption of competence, this Court concludes that counsel rendered ineffective assistance of counsel in the uninformed strategic decision not to call Dr. Cooke as a witness in the penalty phase of the trial. Simply put, counsels' failure to request Dr. Greenfield's report and to make reasonable investigations rendered counsels' performance deficient because it resulted in the uninformed decision to exclude *N.J.S.A.* 2C:11–3c(5)(a), mitigating evidence.

---

different from defendant's previous acts and "could only be considered to relate to antisocial aspects of his character." Thus, the report does not address counsels' concerns or justify their failure to discuss the matter with Dr. Cooke, because Dr. Cooke testified that the additional information of the alleged incestuous relationship, animal cruelty, and defendant's abuse of a young boy would strengthen his opinion.

Generally, this Court confines itself to the record when determining whether the trial court erred. *R.* 2:5–4(a); *State v. Harvey,* 151 *N.J.* 117, 201–02, 699 *A.*2d 596 (1997); *County of Bergen v. Borough of Paramus,* 79 *N.J.* 302, 309–10 n. 2, 399 *A.*2d 616 (1979). Because Dr. Greenfield's report was not part of the record before the PCR court, defendant's motion is denied.

The Court must now consider the prejudice prong. As noted, the *Strickland/Marshall* test requires the Court to determine "whether there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty phase deliberations would have been affected substantially." *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1. That standard does not require a capital defendant to show that the result of the penalty phase would have been different. *Bey, supra,* 161 *N.J.* at 257, 736 *A.*2d 469. Instead, a capital defendant must establish that the reasonable probability that the introduction of the omitted information would have altered the jury's penalty phase deliberations is "'a probability sufficient to undermine confidence in the outcome.'" *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1 (quoting *Strickland,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). Thus, the Court must determine "whether defendant's argument in respect of mitigation, as well as his other asserted errors, undermines the Court's confidence in the outcome of the penalty phase deliberations." *DiFrisco, supra,* 174 *N.J.* at 220, 804 *A.*2d 507.

Here, the determination is whether there is a reasonable probability that Dr. Cooke's testimony in support of the extreme mental or emotional disturbance mitigating factor, *N.J.S.A.* 2C:11–3c(5)(a), would have substantially affected the jury's deliberations at the penalty phase. Dr. Cooke's report and testimony would have provided credible evidence of defendant's mental and emotional instability. To be sure, that mitigating evidence also had a potential downside. Nevertheless, Dr. Cooke was satisfied that the additional evidence of incest, animal abuse, and sexual abuse would have further supported his opinion that defendant was "under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution." *N.J.S.A.* 2C:11–3c(5)(a).

The jury found ten mitigating factors under the catch-all mitigating factor of *N.J.S.A.* 2C:11–3c(5)(h). Based on Dr. Cooke's projected testimony, one or more jurors may have found the

additional mitigating factor that defendant suffered from extreme mental or emotional disturbance, *N.J.S.A.* 2C:11–3c(5)(a). In turn, such a finding might have resulted in at least one juror concluding that the aggravating factors did not outweigh the mitigating factors beyond a reasonable doubt, thus sparing the defendant from the death sentence. In short, if counsel had called Dr. Cooke as a witness, there is a reasonable probability that the "jury's penalty phase deliberations would have been affected substantially." *Marshall III, supra*, 148 *N.J.* at 250, 690 *A.2d* 1. Consequently, because defendant also satisfied the prejudice prong of the ineffective assistance of counsel analysis, a remand is necessary for a new penalty phase trial.

## V.

### *Remaining Arguments*

In light of our decision to reverse the penalty phase trial, we find no reason to address the other issues raised by defendant.

## VI.

### *Conclusion*

The judgment of the Law Division denying defendant's petition is affirmed in part and reversed in part. The matter is remanded to the Law Division for a new penalty phase trial.

Justice VERNIERO, concurring in part and dissenting in part.

I join in the Court's persuasive opinion rejecting defendant's arguments concerning the guilt phase of his prior capital trial. I write only to register my disagreement on the narrow but critical question concerning alleged ineffective assistance of counsel during the prior trial's penalty phase. I do not believe that defendant has satisfied either prong of the test traditionally used to grant relief on such questions. Hence, I cannot sustain his application for post-conviction relief (PCR).

When submitting a claim that a trial counsel has been constitutionally ineffective and that such ineffectiveness is sufficient to set aside a settled verdict, a defendant bears the burden of demonstrating his entitlement to relief. We have described it as a "considerable burden." *State v. DiFrisco*, 174 *N.J.* 195, 245, 804 *A.*2d 507 (2002). The first prong of the test requires that "counsel's acts or [omissions] fall outside the wide range of professionally competent assistance considered in light of all the circumstances." *Id.* at 218, 804 *A.*2d 507 (internal quotation marks and citation omitted). Assuming he or she can clear that hurdle, a capital defendant must "demonstrate prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially." *Id.* at 219, 804 *A.*2d 507 (internal quotation marks and citation omitted).

Within that framework, "a reviewing court must assess the performance of counsel with a heavy measure of deference to counsel's judgments." *Id.* at 220, 804 *A.*2d 507 (internal quotation marks and citation omitted). We must view attorney competence from the perspective of the circumstances that existed at the time of the alleged errors, not how things might appear today "under the distorting effects of hindsight." *Id.* at 221, 804 *A.*2d 507 (internal quotation marks and citation omitted). In short, consistent with the proper functioning of our capital system, "a defendant is entitled to competent counsel, not perfect counsel." *Id.* at 220, 804 *A.*2d 507.

As for the first prong, counsel's decision not to call Dr. Gerald Cooke for the purpose of establishing the mental-or-emotional-disturbance mitigating factor (the 3c(5)(a) factor) was not so wide of the mark to rise to the level of constitutional ineffectiveness. That factor would have focused attention on the horrific manner in which defendant killed his victim, something counsel presumably sought to avoid in both the guilt and penalty phases of trial. It also would have been inconsistent with defendant's denial defense, the pursuit of which the Court correctly concludes did not consti-

tute deficient performance in the guilt phase. The same jurors sat in both the guilt and penalty phases of trial, making consistency an important element of defendant's overall strategy.

In other words, I am in accord with the PCR court below that, given the nature of defendant's acts, his defense was saddled with difficult choices, all of which had pitfalls. In hindsight I acknowledge that counsel could have made different choices or pursued different strategies. But hindsight is not the test. Under the standard of deference required in this setting, defendant's attorneys were not so deficient that they breached constitutional standards. Rather, they pursued a mitigation strategy that emphasized defendant's troubled upbringing and positive relationship with his daughter, deflecting attention from the murder itself.

Even if counsel had acted in a constitutionally deficient manner, I do not believe under the second prong of the analysis that those errors substantially affected the jury's deliberations. Without Dr. Cooke's testimony, various jurors had found a total of ten mitigating factors as separately itemized on the verdict sheet. Finding also that defendant had killed his victim for pecuniary gain, jurors then concluded that that singularly-powerful aggravating factor outweighed the ten mitigating factors beyond a reasonable doubt. Under those circumstances, I remain unconvinced that the establishment of an eleventh mitigating factor, the 3c(5)(a) factor now advocated by current counsel, would have substantially affected the jury's deliberations.

Similarly, irrespective of whether counsel were deficient in not better informing themselves concerning the 3c(5)(a) factor, the fact remains that, had counsel ultimately determined to establish that factor, the State likely would have responded with potent rebuttal evidence. Such evidence would have included information concerning defendant's sexual relationship with his sister and his violent acts as a child. As the State succinctly explains in its brief:

> The issue is not, as defendant argues, whether the information [concerning defendant's incestuous relationship with his sister, Crystal Charette] would have

changed Dr. Cooke's diagnoses. The real issue was whether the damaging information would be revealed on the State's rebuttal.

Dr. Cooke's cross-examination below [at the PCR hearing] shows that damaging information would have been elicited to attack the c(5)(a) mitigating factor. Defendant's psychiatric condition would have been rebutted with evidence that he was simply anti-social. Defendant's bad acts as a child, including setting his grandmother's house on fire, derailing a train, cruelty to animals and his numerous acts of thievery, and his bad acts as an adult, including his adult convictions for fraud and his sexual relationship with Crystal, would have been relevant to explain defendant's anti-social disorder.

I therefore agree with the PCR court that "[w]hatever the positive effects of finding [the 3c(5)(a) factor] might have been, they would have been nullified by the negative features of such testimony." This Court previously has rejected ineffective-assistance claims on similar grounds. *See, e.g., State v. Martini,* 160 *N.J.* 248, 262, 734 *A.*2d 257 (1999) (rejecting ineffective assistance claim related to penalty phase of capital trial and observing that "the presentation of evidence of limited mitigating value would have opened the door to powerful countervailing testimony that could have swayed the jury against defendant"); *DiFrisco, supra,* 174 *N.J.* at 246, 804 *A.*2d 507 (concluding that defendant was not prejudiced by counsel's failure to establish certain mitigating factors because "the unfavorable aspects of the available mitigation evidence significantly diminished its usefulness to defendant").

In sum, defense counsel presented eight witnesses during the penalty phase and established ten mitigating factors under the catch-all category of *N.J.S.A.* 2C:11–3c(5)(h). The Court finds constitutional ineffectiveness in counsel's failure to call one additional witness for the purpose of establishing one additional mitigating factor. Given the reality that the omitted factor would have carried negative features from defendant's perspective, I see nothing in our prior decisions or in the circumstances of this case requiring the Court's holding. Of all our tasks, none is more serious than reviewing a death sentence. In that respect, we must administer New Jersey's capital system by carefully adhering to all constitutional and statutory standards. By the same token, the judiciary must uphold a death sentence when a case comports with

those standards, such as the case here. In so doing, I would conclude that defendant has not satisfied the two-prong test needed for relief. To the extent that the Court holds otherwise, I respectfully dissent.

Chief Justice PORITZ and Justice LaVECCHIA join in this opinion.

*For affirmance in part/reversal in part/remandment*—Justices LONG, ZAZZALI, ALBIN and WALLACE—4.

*For concurrment in part/dissentment in part*—Chief Justice PORITZ and Justices VERNIERO and LaVECCHIA—3.