SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Juan C. Hernandez-Peralta (A-41-23) (089274)**

**Argued November 18, 2024 -- Decided July 22, 2025**

**WAINER APTER, J., writing for the Court.**

In this appeal, the Court considers whether sentencing counsel was constitutionally ineffective for failing to investigate defendant's citizenship status beyond asking him if he was a United States citizen and receiving an unequivocal "yes," and therefore not advising him that his plea could make him subject to deportation.

In 2019, defendant pled guilty to three counts of third-degree burglary and one count of second-degree robbery. During the plea colloquy, the court asked defendant whether he was a United States citizen. Defendant responded, "yes, sir." The court then asked defendant where he was born. Defendant, who was born in Mexico, replied "I was born in New York." The court asked defendant whether he understood "everything" about his plea, the recommended sentence, and the plea forms. Defendant responded, "yes." The court accepted the guilty plea. Defendant was then interviewed by a probation officer for the presentence report. The report stated that defendant "was born in Mexico and moved to New York with his family as a toddler." Many fields on the report were left blank.

At sentencing, defendant was represented by Carol Wentworth of the Public Defender's Office. Wentworth stated that she had "received and reviewed" the presentence report with defendant and that the report was "accurate for the purposes of sentencing." Defendant stated that he was satisfied with Wentworth's representation. The court asked no questions about defendant's citizenship or place of birth, and the parties raised no information about either at the hearing. The court sentenced defendant in accordance with his plea agreement, which included five years of Recovery Court Probation.

Defendant twice violated the terms of Recovery Court Probation, and at the hearing held after each violation stated that he was born in Mexico. After the second violation, the court terminated defendant's Recovery Court Probation and sentenced him to five years' incarceration subject to the No Early Release Act. A new judgment of conviction was entered. Defendant did not appeal.

1

In July 2022, defendant filed a petition for post-conviction relief (PCR), alleging ineffective assistance of counsel because he was "not properly informed of the immigration consequences of [his] plea." The PCR court held evidentiary hearings during which defendant, his plea counsel, and Wentworth testified. The PCR court granted defendant's petition, concluding that plea counsel was effective but sentencing counsel was not. The PCR court found that defendant's untruthfulness "did not relieve sentencing counsel of the obligation to investigate the discrepancies between his claim to be a U.S. citizen and the contrary information presented in the [presentence report]." The PCR court also concluded that defendant established he had been prejudiced by sentencing counsel's deficient performance under Strickland v. Washington, 466 U.S. 668 (1984), because defendant proved "to a reasonable probability that he would have rejected the State's plea offer and not pled guilty had he been properly advised of the adverse immigration consequences."

The Appellate Division affirmed in part and remanded in part. The appellate court agreed that Wentworth "failed to meet her affirmative duty to advise defendant that deportation was a clear consequence of his guilty plea" but determined, on the prejudice prong, that a remand was necessary for the PCR court to consider whether defendant would be entitled to withdraw his plea. The Court granted the State's motion for leave to appeal. 257 N.J. 599 (2024).

**HELD:** Under the circumstances presented here, sentencing counsel was not constitutionally ineffective because her performance was not deficient.

1. Under both the Federal and State Constitutions, criminal defendants are entitled to the effective assistance of counsel. The "benchmark" for judging whether counsel's assistance was constitutionally ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the two-part test: "First, the defendant must show that counsel's performance was deficient," and second, the defendant must show that counsel's "deficient performance prejudiced the defense." Id. at 687. (pp. 17-18)

2. In Padilla v. Kentucky, the United States Supreme Court applied Strickland to the case of a lawful permanent resident. 559 U.S. 356, 359 (2010). Padilla pled guilty to transporting a large quantity of marijuana in his truck, which made his deportation under the Immigration and Nationality Act (INA) "virtually mandatory." Ibid. Yet Padilla's attorney wrongly "told him that he 'did not have to worry about [his] immigration status since he had been in the country so long.'" Ibid. Padilla alleged that he would not have pled guilty "if he had not received [the] incorrect advice from his attorney." Ibid. The Court concluded that counsel's "false assurance" that Padilla's conviction would not result in deportation constituted deficient

2

performance.  Id. at 368.  The Court explained that "[w]hen the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."  Id. at 369.  When, however, "the deportation consequence is truly clear, as it was in [Padilla's] case, the duty to give correct advice is equally clear."  Ibid.  The U.S. Supreme Court therefore held that under the Sixth Amendment, "counsel must inform her client whether his plea carries a risk of deportation."  Id. at 374.  In State v. Gaitan, the Court imposed the following new rule, to be applied "[p]rospectively from the time when the decision in Padilla was announced":  "counsel's failure to point out to a noncitizen client that [the client] is pleading to a mandatorily removable offense will be viewed as deficient performance of counsel."  209 N.J. 339, 380 (2012).  (pp. 19-21)

3.  The Court has previously explained that reasonable professional assistance does not require the best of attorneys -- it simply requires that defendant's attorney is not one so ineffective as to make the idea of a fair trial meaningless.  There was no such ineffectiveness here.  At the time Wentworth met defendant and reviewed the presentence report with him, she had already reviewed his plea form, in which defendant had selected "Yes" in response to the question, "Are you a citizen of the United States?"  The presentence report contains no information that clearly rebuts that statement, or even reasonably calls it into question.  Instead, the information in the report can reasonably be read as consistent with defendant's statements that he was a U.S. citizen.  It therefore did not require sentencing counsel to undertake an investigation beyond asking defendant if he was indeed a U.S. citizen and receiving a response of "yes."  And to the extent that specific blank boxes created ambiguity about defendant's citizenship status, counsel testified that she addressed that ambiguity by asking defendant directly whether he was a United States citizen.  He responded, unequivocally, "yes."  Sentencing counsel reasonably accepted that defendant was a U.S. citizen based on his repeated assertions that he was.  Neither the plea form, nor the presentence report, nor any other information provided to Wentworth by the time of sentencing clearly called that assertion into question.  In the circumstances of this case, sentencing counsel's failure to do more than ask her client if he was a U.S. citizen does not constitute deficient performance under Strickland.  No court has found that sentencing counsel has a constitutional duty under Strickland or Padilla to independently verify or investigate a client's citizenship status beyond asking the client if they are a citizen, and the Court declines to hold that such a duty exists.  (pp. 22-29)

4.  The Court adds two points.  First, it is not clear that defendant was deportable under the INA at the time of sentencing because he had not actually pled guilty to an aggravated felony, and no argument or finding was made that his convictions for two crimes of moral turpitude rendered him deportable.  In the Court's view, this highlights that it is often not immediately obvious, even to attorneys and judges who

3

carefully study the question, how federal immigration laws apply to state criminal matters, and it supports the exercise of caution in labeling an attorney's representation to be outside the wide range of reasonable professional assistance. Second, the Court explains why, even if sentencing counsel's performance was deficient, defendant failed to establish prejudice pursuant to Strickland.  (pp. 29-35)

**REVERSED and REMANDED to the PCR court.**

**JUSTICE NORIEGA, dissenting,** expresses the view that defendant's plea should be vacated.  Justice Noriega explains that Padilla imposes an affirmative duty on counsel to advise noncitizen clients of the immigration consequences of their guilty plea when the consequence is truly succinct, clear, and straightforward -- an obligation that cannot be discharged through the overly broad, standalone question: "Are you a U.S. citizen?"  In Justice Noriega's view, a simple yes-or-no citizenship question, without further investigation or discussion, is constitutionally deficient for two reasons:  first, it assumes the client fully understands their own immigration status and its legal significance; second, it abdicates counsel's duty to investigate and advise where necessary.  Justice Noriega explains that, just as it would be ineffective for an attorney to simply ask, "Do you understand the plea?" it is equally insufficient to ask about a client's citizenship without making any further efforts to confirm that status or advise on immigration consequences.  To do so is to treat Padilla as an administrative formality rather than a mandate for effective representation, Justice Noriega writes.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, and HOFFMAN join in JUSTICE WAINER APTER's opinion.  JUSTICE NORIEGA filed a dissent, in which JUSTICE FASCIALE joins.**

4

State of New Jersey,

Plaintiff-Appellant,

v.

Juan C. Hernandez-Peralta,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| November 18, 2024 | July 22, 2025 |

Shiraz I. Deen, Assistant Prosecutor, argued the cause for appellant (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellate Attorney, of counsel, and Shiraz I. Deen, on the briefs).

Stefan Van Jura, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public Defender, attorney; Stefan Van Jura, of counsel and on the briefs).

Leslie-Ann M. Justus, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Leslie-Ann M. Justus, of counsel and on the brief).

Anne M. Collart argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey

(Gibbons, attorneys; Anne M. Collart and Elena M. Cicognani, on the brief).

JUSTICE WAINER APTER delivered the opinion of the Court.

In this appeal, we consider whether sentencing counsel was constitutionally ineffective for failing to investigate defendant's citizenship status beyond asking him if he was a United States citizen and receiving an unequivocal "yes," and therefore not advising him that his plea could make him subject to deportation. Defendant repeatedly represented that he was a U.S. citizen, including to plea counsel, the court, and on his plea agreement form. Defendant's presentence report lacked any clear indication of non-citizenship, and sentencing counsel was informed of no such indication outside of the report. In addition, plea counsel had already informed defendant that his plea could make him subject to deportation if he was not a U.S. citizen, and defendant chose to plead guilty nonetheless. We hold that under the circumstances presented here, sentencing counsel was not constitutionally ineffective because her performance was not deficient. We therefore reverse the judgment of the Appellate Division.

I.

A.

In 2019, defendant was involved in several burglaries and a robbery in Lakewood Township. He was indicted on multiple counts, including second-degree robbery, third-degree burglary, third-degree theft, third-degree aggravated assault on a law enforcement officer, third- and fourth-degree resisting arrest, and fourth-degree criminal mischief.

On November 22, 2019, defendant pled guilty to three counts of third-degree burglary and one count of second-degree robbery. He was represented at the hearing by Michael Vito of the Public Defender's Office. During the plea colloquy, defendant admitted that he entered two structures in Lakewood "with the purpose to . . . take items that did not belong to" him. He also admitted to "trying to take clothing and cash from [cash] register drawers" and "knowingly inflict[ing] bodily harm" on a police officer by "throwing the stolen metal cash register drawers at the officer who was trying to effectuate an arrest."

Under the plea, defendant's potential sentencing exposure was twenty-five years, but the State agreed to recommend a sentence of five years'

Recovery Court Probation[1] with an alternate sentence of five years' imprisonment subject to the No Early Release Act (NERA).

During the plea colloquy, the court asked defendant whether he was a United States citizen. Defendant responded, "yes, sir." The court then asked defendant where he was born. Defendant, who was born in Mexico, replied "I was born in New York." The court asked defendant whether he understood "everything" about his plea, the recommended sentence, and the plea forms. Defendant responded, "yes." The court accepted the guilty plea.

Soon thereafter, defendant was interviewed by a probation officer for the presentence report. The report stated that defendant "was born in Mexico and moved to New York with his family as a toddler." It recounted that defendant's mother lived in Mexico, but defendant was unsure if she was employed, and that defendant's father lived in New York, but defendant was also unsure if he was employed. Defendant had three full siblings, all of whom lived in New Jersey, the report detailed: one was employed, one was unemployed, and defendant was unsure about the third. Defendant moved to Lakewood at age nineteen and lived with his aunt, brother, and cousin in a six-bedroom home.

---

[1] At the time of the plea hearing, Recovery Court was known as Drug Court. We refer to it as Recovery Court throughout this opinion.

4

The report indicated that defendant previously had a six-month driver's license suspension for possession of marijuana and that he was receiving outpatient treatment for substance abuse. Many fields on the report were left blank, including: "Social Security Number," "Driver's License Number," "Residence Phone," "Emergency Phone," "Offense Date," "Alien Status," "Citizenship" (a checkbox with options for "US" and "Other"), "Other Citizenship (Nationality)," "Language," "Date Prepared," and "Date Approved."

Defendant appeared for sentencing on December 10, 2019, before the same judge who had accepted the plea. He was represented by Carol Wentworth, also of the Public Defender's Office. Wentworth stated that she had "received and reviewed" the presentence report with defendant and that the report was "accurate for the purposes of sentencing." Defendant stated that he was satisfied with Wentworth's representation. The court asked no questions about defendant's citizenship or place of birth, and the parties raised no information about either at the hearing.

Pursuant to the plea agreement, the court sentenced defendant to five years of Recovery Court Probation. If defendant did not comply with the Recovery Court treatment program requirements, the court cautioned, then he would "receive a substantial prison sentence on the second-degree robbery

5

charge . . . . [b]ut we hope it never comes to that." The judgment of conviction (JOC) included only the sentence of five years' Recovery Court Probation.

Defendant violated the terms of Recovery Court Probation almost immediately. In February 2020, again represented by Vito, defendant appeared before the same judge to plead guilty to several probation violations. The court again asked defendant if he was a U.S. citizen, and defendant again confirmed that he was. The court asked defendant where he was born. This time, defendant answered, "Mexico." Neither the court nor Vito noticed the discrepancy. The court released defendant, concluding: "I have no interest in sending you to State Prison, but I don't have a choice after a while."

Defendant again violated the terms of his Recovery Court Probation beginning in March 2020, and was eventually arrested. At a hearing in August 2020, defendant was once again represented by Wentworth. The court again confirmed that defendant was a U.S. citizen, and defendant again stated that he was born in Mexico. Defendant then pled guilty to multiple probation violations. Wentworth requested that defendant be placed in an inpatient treatment facility, but the court terminated defendant's Recovery Court Probation and sentenced defendant to five years' incarceration subject to NERA. A new judgment of conviction was entered. Defendant did not appeal.

6

B.

In July 2022, defendant filed a petition for post-conviction relief (PCR), alleging ineffective assistance of counsel because he was "not properly informed of the immigration consequences of [his] plea." The PCR court held evidentiary hearings during which defendant, Vito, and Wentworth testified.

Defendant testified that his family had told him he was a U.S. citizen. He had therefore believed he was a U.S. citizen until 2022, when he received an immigration detainer "saying [he would] be deported."

Defendant admitted that, at the time he told the court he was born in New York, he knew that statement was not true. When asked why he told the court one thing, and the probation officer something different "[j]ust a couple days later," defendant responded: "I guess I was paranoid around that time . . . . I wasn't thinking clearly." Defendant further testified that he told the probation officer, but not Vito or Wentworth, that he had a "green card."[2] According to defendant, he did not have any conversations with Wentworth about his immigration status and did not tell her that he had previously told Vito and the court that he was born in New York.

---

[2] A permanent resident card, also known as a "green card," allows holders to "live and work permanently in the United States." Green Card, U.S. Citizenship & Immigr. Servs., https://www.uscis.gov/green-card (last visited July 2, 2025).

7

Vito testified that while negotiating the plea to the original offenses, he reviewed the plea form with defendant. At the time of defendant's plea, Question 17[3] read:

> a. Are you a citizen of the United States? [Yes] [No]
>
> If you have answered "No" to this question, you must answer Questions 17b - 17f. If you have answered "Yes" to this question, proceed to Question 18
>
> b. Do you understand that if you are not a citizen of the United States, this guilty plea may result in your removal from the United States and/or stop you from being able to legally enter or re-enter the United States? [Yes] [No]
>
> c. Do you understand that you have the right to seek individualized advice from an attorney about the effect your guilty plea will have on your immigration status? [Yes] [No]
>
> d. Have you discussed with an attorney the potential immigration consequences of your plea? If the answer is "No," proceed to question 17e. If the answer is "Yes," proceed to question 17f. [Yes] [No]
>
> e. Would you like the opportunity to do so? [Yes] [No]
>
> f. Having been advised of the possible immigration consequences and of your right to seek individualized legal advice on your immigration consequences, do you still wish to plead guilty? [Yes] [No]

---

[3] Question 17 was amended on July 2, 2025. The amendment is not relevant to this case.

Vito testified that when they reached Question 17(a), defendant stated that he was a U.S. citizen and was born in New York.  Despite this response, Mr. Vito testified, he nevertheless reviewed Questions 17(b) through (f) with defendant, as was his usual practice, crossing out each item in turn.  In other words, Vito testified that he explicitly told defendant:  "Do you understand that if you are not a citizen of the United States, this guilty plea may result in your removal from the United States and/or stop you from being able to legally enter or re-enter the United States?"

Wentworth testified that before the sentencing hearing, she reviewed the plea form and sat with defendant to review the presentence report.  She noticed that the presentence report stated defendant was born in Mexico and the plea form stated defendant was a U.S. citizen.  She therefore asked defendant, "Are you a U.S. citizen?"  Defendant responded, "yes."

Wentworth further testified that she saw the presentence report was missing defendant's Social Security number, so she asked defendant what it was.  Defendant responded, "I don't recall."  This did not "set up red flags" for Wentworth because "most" of her clients did not have their Social Security numbers memorized, and defendant did not state that he did not have a Social Security number, only that he could not remember it.

Wentworth also noticed that the field on the report marked "Other Citizenship (Nationality)" was blank. She did not believe it necessary to delay sentencing to amend the report, she testified, because fields on presentence reports were "often" left blank. She also testified that it was not her "normal practice," nor the "normal practice for most attorneys," to "rehash[] and re-go[] over all of the immigration" information at sentencing, especially because she knew it had been diligently explored by Vito while negotiating the plea, and by the judge when accepting the plea.

Wentworth testified that she did not know that defendant had previously told Vito and the court that he was born in New York; had she known, it "would have rung bells." She also stated that if the presentence report had indicated that defendant had a green card, which it did not, or if defendant had said anything about having a green card, which he did not, that would have been a "red flag, obviously."

The PCR court granted defendant's petition, concluding that plea counsel was effective but sentencing counsel was not. The PCR court found that defendant had been "untruthful to [the court] and plea counsel regarding his place of birth," but that defendant's untruthfulness "did not relieve sentencing counsel of the obligation to investigate the discrepancies between his claim to be a U.S. citizen and the contrary information presented in the

10

[presentence report]." Specifically, the court stated that the missing citizenship information, Social Security number, driver's license number, and telephone number, combined with the fact that defendant's "mother [was] not in the country," defendant did not "have contact with his father," and defendant did not have "any steady employment," all "pretty much confirm[ed]" that defendant was "not a U.S. citizen."

The court found that "under prevailing professional norms," a "competent defense attorney" in Wentworth's position would have addressed these "discrepanc[ies]" by asking that sentencing be postponed, questioning defendant about his citizenship on the record, or otherwise attempting to "verify defendant's claims." This was necessary, the court concluded, because under Padilla v. Kentucky, 559 U.S. 356 (2010), and State v. Gaitan, 209 N.J. 339 (2012), someone like defendant "pleading guilty to an aggravated felony must be advised that they're subject to mandatory deportation." Defendant was not so advised, and the "boilerplate language" from Question 17 that Vito had explained to defendant, the court held, did not suffice.

The PCR court also concluded that defendant established he had been prejudiced by sentencing counsel's deficient performance under Strickland v. Washington, 466 U.S. 668 (1984), because defendant proved "to a reasonable probability that he would have rejected the State's plea offer and not pled

11

guilty had he been properly advised of the adverse immigration consequences." According to the court, "[i]t would have been illogical for [defendant] to accept [Recovery] Court probation and expect to complete same if he knew he was going to be deported."

The Appellate Division affirmed in part and remanded in part. The appellate court agreed with defendant that "there were sufficient facts in the [presentence report] to put sentencing counsel on notice that defendant may not be a U.S. citizen" and that Wentworth therefore "failed to meet her affirmative duty to advise defendant that deportation was a clear consequence of his guilty plea under Padilla."

However, the Appellate Division determined that the PCR court "erred by conflating the potential prejudice caused by a deficiency in counsel's performance at the plea stage and that potentially caused by any error committed by sentencing counsel." Because defendant "had already pled guilty" at the time of sentencing counsel's deficient performance, the Appellate Division held that defendant could "establish sentencing counsel's failure to further investigate his citizenship prejudiced him only if that investigation would have led to a successful motion to withdraw his guilty plea." Thus, the appellate court remanded for the PCR court to consider whether defendant would be entitled to withdraw his plea under the four-factor

12

balancing test set forth in State v. Slater, 198 N.J. 145, 157-58 (2009): (1) whether defendant "asserted a colorable claim of innocence"; (2) the "nature and strength" of defendant's reasons for seeking to withdraw the plea; (3) whether there was a plea bargain; and (4) whether withdrawing the plea would unfairly prejudice the State or unfairly advantage defendant.

We granted the State's motion for leave to appeal. 257 N.J. 599 (2024). We also granted leave to appear as amici curiae to the Attorney General and the Association of Criminal Defense Lawyers of New Jersey (ACDL).

After we granted leave to appeal, defense counsel notified us that defendant had been deported to Mexico. The State nonetheless agrees that the case is not moot because defendant's "ability to pursue immigration remedies that could allow him to return to the United States is contingent on whether he is entitled to relief in [this] action." We therefore proceed to the merits of this appeal.

## II.

## A.

The State argues that the PCR court's and Appellate Division's holdings wrongly expand the "simple, straightforward duty" set forth in Padilla and Gaitan "by holding that the Sixth Amendment requires defense attorneys to not only provide immigration advice when the immigration consequences of a plea

13

are clear, but also to provide correct advice when their own clients" intentionally lie to "their own attorneys and the courts about their immigration status." Here, "[t]he record demonstrates that it was [d]efendant's own actions in lying to his attorney and the Plea Court that prevented him from receiving" more specific immigration advice at the time of his plea. The presentence report, the State maintains, "did not directly indicate in any way that [d]efendant was not a US citizen." Therefore, "[r]equiring an attorney to suspect a client is not a citizen when they unambiguously insist that they are, without any direct evidence to the contrary," the State contends, "imposes an obligation on sentencing counsel that has never been established and is arguably discriminatory against foreign-born citizens on its face."

The Attorney General agrees. In the Attorney General's view, defendant cannot prevail because "nothing in the record available to sentencing counsel contradicted defendant's consistent claim that he was a U.S. citizen, and . . . defendant had already been prophylactically (and competently) advised of the deportation consequences by plea counsel in any event." Nothing in the presentence report was an "indication that defendant was a noncitizen," the Attorney General asserts, as a "Permanent Resident Card, an A-number (or 'Alien Registration Number'), visa, re-entry permit, [or] Employment Authorization Card" would have been. Absent such information, "sentencing

counsel acted reasonably under the circumstances and in accordance with professional norms by asking defendant to confirm his U.S. citizenship status, which he unequivocally did."  In addition, plea counsel "informed defendant of the deportation consequences of pleading guilty if he were a noncitizen," the Attorney General maintains, so sentencing counsel cannot possibly be "constitutionally ineffective for failing to repeat the same advice regarding deportation consequences that plea counsel already had provided."

B.

Defendant argues that the Appellate Division's decision should be affirmed because it "constitute[s] a straightforward application of defense counsel's . . . obligation to conduct reasonable investigations" under Strickland.  According to defendant, because Wentworth was "presented with information that defendant might not be a U.S. citizen -- and, indeed, that defendant himself might incorrectly believe that he was -- she had a duty to conduct a basic investigation into his immigration status."  Specifically, defendant asserts that the following information from the presentence report "should have set off alarm bells" for Wentworth:  that "defendant was born in Mexico and brought here as a child," that the fields for "Citizenship," Social Security number, and driver's license number were left blank, that "defendant's mother was in Mexico," and that defendant "had no contact with

15

his father." Wentworth's failure to do anything beyond "merely confirm that defendant believed he was a citizen" therefore constitutes deficient performance, defendant contends. In other words, defendant argues that "sentencing counsel's performance was constitutionally deficient because information she learned prior to sentencing would have caused reasonable counsel to investigate defendant's immigration status, determine that he was not a citizen, and advise him that he would be subject to mandatory deportation."

In support of defendant, the ACDL argues that the immigration consequences in this case were clear, and sentencing counsel's performance was thus deficient under Strickland, Padilla, and Gaitan. "It is not sufficient for counsel to rely on a defendant's statement that he is a U.S. citizen in the face of information to the contrary," the ACDL maintains. Instead, "defendant's right to adequate investigation depends not only on what [he] says but also on what red flags are revealed during the course of the proceedings." Like defendant, the ACDL contends that the presentence report should have "caused sentencing counsel . . . concern" because it indicated that defendant was born in Mexico and his mother lived outside the United States, and because the fields for citizenship status, Social Security number, and driver's license were left blank.

III.

A.

Our review of a PCR court's factual findings is "necessarily deferential." State v. Nash, 212 N.J. 518, 540 (2013). However, we review a PCR court's legal conclusions de novo. State v. Harris, 181 N.J. 391, 419 (2004).

B.

Under both the Federal and State Constitutions, criminal defendants are entitled to the effective assistance of counsel. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; Strickland, 466 U.S. at 684-85; State v. Fritz, 105 N.J. 42, 58 (1987). The "benchmark" for judging whether counsel's assistance was constitutionally ineffective is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686.

A defendant alleging ineffective assistance of counsel must satisfy both prongs of the two-part test set forth in Strickland and adopted by this Court in Fritz. "First, the defendant must show that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687; Fritz, 105 N.J. at 52. Second, the defendant must show that counsel's "deficient performance prejudiced the

17

defense." Ibid. Specifically, defendant "must show that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 694).

On the first prong, counsel's performance is held to a standard of "reasonableness under prevailing professional norms"; thus, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Courts owe "extreme deference" when "evaluating the performance of counsel," Fritz, 105 N.J. at 52, and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689.

As part of the obligation to provide constitutionally effective representation, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. However, courts cannot fault counsel "for failing to expend time or resources analyzing events about which they were never alerted." State v. DiFrisco, 174 N.J. 195, 228 (2002).

C.

In Padilla v. Kentucky, the United States Supreme Court applied Strickland to the case of a lawful permanent resident who lived in the United States for more than forty years and served the country "with honor as a member of the U.S. Armed Forces during the Vietnam War." 559 U.S. at 359. Padilla pled guilty to transporting a large quantity of marijuana in his truck. Ibid. Under the Immigration and Nationality Act (INA), "[a]ny alien[4] who . . . has been convicted of a violation of . . . any law or regulation of a State . . . relating to a controlled substance . . . is deportable." 8 U.S.C. § 1227(a)(2)(B)(i). As the Supreme Court explained, that made Padilla's "deportation virtually mandatory." 559 U.S. at 359. Yet Padilla's attorney wrongly "told him that he 'did not have to worry about [his] immigration status since he had been in the country so long.'" Ibid. Padilla alleged that he would not have pled guilty "if he had not received [the] incorrect advice from his attorney." Ibid.

The Court concluded that counsel's "false assurance" that Padilla's conviction would not result in deportation constituted deficient performance, id. at 368, and that "constitutionally competent counsel would have advised

_____

[4] Under the INA, "[t]he term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

19

[Padilla] that his conviction for drug distribution made him subject to automatic deportation," id. at 360. The Court acknowledged that "[i]mmigration law can be complex" and there are "numerous situations in which the deportation consequences of a particular plea are unclear or uncertain." Id. at 369. However, in Padilla's case, "counsel could have easily determined that his plea would make him eligible for deportation simply from reading the text of the statute" quoted above. Id. at 368.

"When the law is not succinct and straightforward . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. at 369. When, however, "the deportation consequence is truly clear, as it was in [Padilla's] case, the duty to give correct advice is equally clear." Ibid. The Court therefore held that under the Sixth Amendment, "counsel must inform her client whether his plea carries a risk of deportation." Id. at 374.

In State v. Gaitan, we considered whether Padilla constituted a "new rule of constitutional law" such that it did not apply retroactively in PCR cases. 209 N.J. at 369. In holding that it did, we noted that we had previously imposed a more limited rule, finding ineffective assistance of counsel only where "counsel provides false or affirmatively misleading advice about the deportation consequences of a guilty plea." Id. at 351 (citing State v. Nuñez-

20

Valdéz, 200 N.J. 129, 131 (2009)).  But in Padilla, the United States Supreme Court went further, "holding that defense attorneys now must advise their clients of potential immigration consequences of pleading guilty."  Id. at 346.

Therefore, we imposed the following new rule, to be applied "[p]rospectively from the time when the decision in Padilla was announced": "counsel's failure to point out to a noncitizen client that [the client] is pleading to a mandatorily removable offense will be viewed as deficient performance of counsel."  Id. at 380.  We advised that "affirmative advice must be conveyed as part of the counseling provided when a client enters a guilty plea to a state offense that equates to an aggravated felony, triggering eligibility for mandated removal," and the information must be "placed on the record with a noncitizen defendant prior to a court's acceptance, and entry, of a guilty plea."  Id. at 380-81.[5]

## IV.

We hold that defendant has not met his burden to show that sentencing counsel's performance was deficient in this case.  As we have previously held, reasonable professional assistance does not require "the best of attorneys" -- it

---

[5]  We agree with the dissent that the term "mandatory" appears nowhere in the INA.  Although the statute provides that certain noncitizens are "deportable," it does not subject any noncitizen to "mandatory" removal.  Gaitan's discussion of "mandatory" removability therefore "lacks textual support" in the INA.  See post at ___ (slip op. at 5 n.2); 8 U.S.C. § 1227(a).

simply requires that defendant's attorney is "not one so ineffective as to make the idea of a fair trial meaningless." State v. Davis, 116 N.J. 341, 351 (1989), superseded on other grounds by constitutional amendment, N.J. Const. art. I, ¶ 12, as recognized in State v. Cruz, 162 N.J. 403, 411 (2000). There was no such ineffectiveness here.

A.

Sentencing counsel, whose testimony the PCR court deemed credible, testified that it was not her "normal practice" to "rehash[] and re-go[] over all of the immigration information at sentencing," especially when she knew that it had been diligently explored by Vito while negotiating the plea and by the judge when accepting it. The PCR court and the Appellate Division held that, despite defendant's repeated statements that he was a U.S. citizen, sentencing counsel was constitutionally required to investigate his immigration status further because of information that was included in and excluded from the presentence report, and that her failure to do so constituted deficient performance.

We disagree. In doing so, we "make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at

the time.'"  State v. Pierre, 223 N.J. 560, 579 (2015) (omission in original) (quoting Strickland, 466 U.S. at 689).

At the time Wentworth met defendant and reviewed the presentence report with him, she had already reviewed his plea form, in which defendant had selected "Yes" in response to the question, "Are you a citizen of the United States?"  The presentence report contains no information that clearly rebuts that statement, or even reasonably calls it into question.  Instead, the information in the report can reasonably be read as consistent with defendant's statements that he was a U.S. citizen.  It therefore did not require sentencing counsel to undertake an investigation beyond asking defendant if he was indeed a U.S. citizen and receiving a response of "yes."

We address each "discrepancy" relied on by the PCR court and the Appellate Division in turn.  First, defendant's birthplace of Mexico does not indicate that he was not a U.S. citizen.  Children born "outside of the United States may be U.S. citizens at birth if one or both parents were U.S. citizens at their time of birth."  U.S. Citizenship & Immigr. Servs., 12 United States Citizenship and Immigration Services Policy Manual pt. A, ch. 2 (updated June 24, 2025) [hereinafter USCIS Policy Manual], https://www.uscis.gov/policy-manual/volume-12-part-a-chapter-2; see 8 U.S.C. § 1401.  In addition, people can become citizens "after birth, but before the age of 18, through their U.S.

23

citizen parents." USCIS Policy Manual; see 8 U.S.C. §§ 1431(a), 1433. And people born outside the United States without U.S. citizen parents "may become U.S. citizens through naturalization." USCIS Policy Manual; see 8 U.S.C. §§ 1421 to 1458. It is therefore not surprising that sentencing counsel testified that she had previously represented "a lot" of clients who were U.S. citizens but had been born in different countries.

Nor does the information in the presentence report about defendant's family suggest that he was not a citizen. The PCR court stated that according to the report, defendant's "mother [was] not in the country" and defendant did not "have contact with his father," which indicated that defendant was not a U.S. citizen. That is incorrect. The presentence report actually stated that defendant's mother lived in Mexico, his father lived in New York, and defendant did not know if either was employed. It did not reveal how much or how little contact defendant had with his father. And even if sentencing counsel had assumed from the report that defendant's mother was not a U.S. citizen, defendant could have been born a citizen if his father was a U.S. citizen at the time of his birth, or he could have been naturalized before turning eighteen if his father had been naturalized before that time. Similarly, the PCR court did not mention the report's statement that defendant had three full siblings, all of whom lived in New Jersey. Taken together, the

24

information in the report about defendant's family did not show that defendant was not a U.S. citizen.

Neither did information that was not included in the report. As the PCR court pointed out, entries for defendant's driver's license number, Social Security number, and telephone numbers were left blank. But a fair reading of the record reflects that such information likely existed and was simply left out of the report. As to defendant's Social Security number, when Wentworth asked defendant what it was, he did not state "I don't have one." He stated that he did not "recall" it. And defendant then included his Social Security number on his PCR petition and testified at the PCR hearing that he had a Social Security number. As to defendant's driver's license number, the presentence report indicates that defendant had a driver's license suspension in 2016, suggesting either that he previously had a driver's license, or had one at the time of the presentence report but simply did not have the number available. And as to defendant's telephone number, sentencing counsel stated on the record at sentencing that defendant had a new phone number and would provide it to Probation Services.

In any event, in December 2019, lawful permanent residents could obtain Social Security numbers and New Jersey driver's licenses. See, e.g., Social Security Admin., Social Security Numbers for U.S. Permanent

Residents, https://www.ssa.gov/ssnvisa/Handout_11_1.html (last visited July 2, 2025); N.J.A.C. 13:21-8.2 (2019). And anyone can obtain a telephone number. None of this information reveals a person's citizenship status.

Also left blank on the presentence report were the fields for "Alien Status," "Citizenship" (a checkbox with options for "US" and "Other"), and "Other Citizenship (Nationality)." But many other fields on the form were similarly blank, despite calling for information that was likely available to both defendant and the probation officer who drafted the report. These include fields for "Residence Phone," "Emergency Phone," "Offense Date," "Date Prepared," "Date Approved," "Language," and more. The many empty fields on the report make any particular field left blank appear less concerning.

Indeed, sentencing counsel testified at the PCR hearing that fields were "often" left blank on presentence reports, and were not "inaccurac[ies]" that would justify delaying a sentencing hearing. And to the extent that specific blank boxes created ambiguity about defendant's citizenship status, counsel testified that she addressed that ambiguity by asking defendant directly whether he was a United States citizen. He responded, unequivocally, "yes."

In sum, the information upon which the PCR court and Appellate Division relied -- defendant's birthplace outside of the United States, the information about his parents, and the fields left blank on the presentence

26

report -- are, in the context of this case, not clear indicia of non-citizenship. As all parties agree, evidence that a defendant had a "green card," an Alien Registration Number or "A-Number," a visa, a re-entry permit, or an Employment Authorization Card would all be clear indicia of non-citizenship. But no such evidence existed in this case. Defendant steadfastly maintained he was a U.S. citizen and never informed sentencing counsel that he had a green card. And while defendant did testify that he told the probation officer that he had a green card, no mention of it appeared on the presentence report.

Sentencing counsel reasonably accepted that defendant was a U.S. citizen based on his repeated assertions that he was. Neither the plea form, nor the presentence report, nor any other information provided to Wentworth by the time of sentencing clearly called that assertion into question. Moreover, Wentworth testified that she was not aware that defendant had previously told plea counsel and the court that he was born in New York. Therefore, in the circumstances of this case, sentencing counsel's failure to do more than ask her client if he was a U.S. citizen does not constitute deficient performance under Strickland.

B.

Our conclusion is bolstered by the fact that no court has found that sentencing counsel has a constitutional duty under Strickland or Padilla to

27

independently verify or investigate a client's citizenship status beyond asking the client if they are a citizen. See, e.g., Okeowa v. State, 337 So. 3d 767, 771 (Ala. Crim. App. 2021) (stating that Padilla creates a duty to advise when counsel "knows of his or her client's citizenship status" but "does not create a separate duty for counsel to ask every client about his or her citizenship status"); State v. Sewell, 314 So. 3d 811, 814 (La. 2020) (concluding that Padilla does not "impose[] a duty on every defense attorney" to "inquire" about a client's citizenship status because under Strickland, "there may be no obligation to inquire into immigration status where counsel did not know, and did not have reason to know, that defendant was a noncitizen"); Bobadilla v. State, 117 N.E.3d 1272, 1283 (Ind. 2019) (finding deficient performance because plea counsel assumed without asking that his client was a citizen, and marked "N/A" on the plea form's Padilla warning, despite receiving a judicial document that listed his client's birthplace as "Mexico" -- and admonishing that "[t]he best practice is to never assume a client's citizenship status: always ask"); Najera v. State, 422 P.3d 661, 668-69 (Haw. Ct. App. 2018) (determining "that defense counsel who lacks information about a defendant's citizenship status has the burden of asking the defendant whether he or she is a citizen," but specifying that, "[i]f the client informs or even misinforms defense counsel that he or she is a citizen, then defense counsel would be

28

absolved of the responsibility of providing advice to the client regarding the deportation consequences of the client's guilty or no contest plea"); Commonwealth v. Lavrinenko, 38 N.E.3d 278, 290 (Mass. 2015) (failure of a defense attorney to ask their client about citizenship and immigration status can "satisfy the deficient performance prong of the ineffective assistance analysis.").

Under Strickland, counsel's performance is evaluated by an objective standard of reasonableness. 466 U.S. at 688-89. As the above list of cases demonstrates, no court has held that a reasonable attorney must investigate a client's citizenship status beyond asking the client if they are a citizen. We decline to do so now.

C.

We add two additional points.

First, both the PCR court and the Appellate Division concluded that sentencing counsel's representation was deficient because she failed to discover that defendant was a noncitizen and therefore failed to advise him that his prior plea to an "aggravated felony" made him subject to "mandatory deportation." Defendant agrees, arguing: "[T]he only correct advice to give [in this case] was, 'You will be deported because you're not a citizen and

29

you're pleading guilty to an aggravated felony.'  Anything short of that advice was deficient performance."

But it appears that at the time of sentencing, defendant had not actually pled guilty to an aggravated felony.  Under the INA, "any alien who is convicted of an aggravated felony at any time after admission is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii).  The definition of "aggravated felony" includes "a crime of violence . . . for which the term of imprisonment [is] at least one year," 8 U.S.C. § 1101(a)(43)(F), and "a theft offense . . . or burglary offense for which the term of imprisonment [is] at least one year," id. at (G).

Every federal court to have considered the question has held that the language "for which the term of imprisonment [is] at least one year" means the sentence that is actually imposed, not potential or possible sentences.  See United States v. Graham, 169 F.3d 787, 790 (3d Cir. 1999); United States v. Pacheco, 225 F.3d 148, 154 (2d Cir. 2000); Alberto-Gonzalez v. INS, 215 F.3d 906, 909-10 (9th Cir. 2000); United States v. Guzman-Bera, 216 F.3d 1019, 1020 (11th Cir. 2000); United States v. Gonzalez-Coronado, 419 F.3d 1090, 1093 (10th Cir. 2005); Shaya v. Holder, 586 F.3d 401, 403, 407 (6th Cir. 2009); United States v. Asencio-Perdomo, 674 F.3d 444, 446-47 (5th Cir. 2012).  Federal courts have further held that "if the sentencing court orders probation" and does not impose any term of imprisonment, "then that

30

conviction does not count as a term of imprisonment or as an aggravated felony." United States v. Mondragon-Santiago, 564 F.3d 357, 368 (5th Cir. 2009); accord Guzman-Bera, 216 F.3d at 1020-21; Gonzalez-Coronado, 419 F.3d at 1093.

Under that interpretation, at the time of the initial sentencing hearing defendant would not have been convicted of an "aggravated felony" under section 1101(a)(43)(F) or (G) because he was sentenced only to five years of Recovery Court Probation and was not sentenced to any term of incarceration. That is the sentence the judge imposed orally, and it is the sentence reflected in writing on the initial JOC (listing five years of Recovery Court Probation, with zero years and zero months incarceration). At the time of sentence, therefore, defendant would not have been "deportable" under the INA due to a conviction for an "aggravated felony," and any statement that he was could have exposed his attorney to the same type of ineffective assistance claim brought here.

The dissent argues that defendant would have been deportable under the INA at the time he was originally sentenced not because he had been convicted of an "aggravated felony" under 8 U.S.C. § 1101(a)(43)(F) or (G), but because the Department of Homeland Security (DHS) could have argued that burglary in violation of New Jersey law is a crime of moral turpitude and his guilty plea

31

to two burglaries thus made him removable under 8 U.S.C. § 1227(a)(2)(A)(ii) ("Any alien who at any time after admission is convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct . . . is deportable.").

Yet no party in this case, including defendant, ever briefed or argued that defendant was deportable under 8 U.S.C. § 1227(a)(2)(A)(ii) for having been convicted of two crimes involving moral turpitude. And neither the PCR court nor the Appellate Division so held. This highlights that it is often not immediately obvious, even to attorneys and judges who carefully study the question, how federal immigration laws apply to state criminal matters. See Padilla, 559 U.S. at 369. We therefore exercise caution before labeling an attorney's representation as outside "the wide range of reasonable professional assistance." Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 689).

Second, the dissent asserts that sentencing counsel's performance "was clearly prejudicial." Post at ___ (slip op. at 2). We disagree.

Even if sentencing counsel's performance was deficient, and even if she should have discovered that defendant was not a citizen, the only competent advice the dissent says counsel should have then provided was that defendant had "enter[ed] into a plea that included offenses that DHS could allege made him deportable." Post at ___ (slip op. at 5). But that is the advice that Vito

32

had already provided at the time of the plea. As earlier noted, Vito testified that despite defendant stating that he was a U.S. citizen and was born in New York, Vito read the entirety of Questions 17(b) through (f) of the plea form with defendant, crossing out each item in turn. He therefore specifically told defendant, "Do you understand that if you are not a citizen of the United States, this guilty plea may result in your removal from the United States and/or stop you from being able to legally enter or re-enter the United States?"

Moreover, even if Wentworth had discovered that defendant was a noncitizen and had provided the immigration warnings the dissent urges were constitutionally required, as the Appellate Division pointed out, defendant "had already pled guilty" at that point. To prove a Sixth Amendment violation, defendant was required to show "that there is 'a reasonable probability that, but for [Wentworth's] unprofessional errors, the result of the proceeding would have been different.'" Fritz, 105 N.J. at 52 (quoting Strickland, 466 U.S. at 694). As the Appellate Division explained, defendant could show a reasonable probability that the result of his sentencing would have been different only by showing that competent performance by sentencing counsel "would have led to a successful motion to withdraw his guilty plea" under State v. Slater, 198 N.J. at 157-58.

33

The dissent responds both that "the PCR court's <u>Strickland</u> analysis obviates the need for application of <u>Slater</u>" and that a <u>Slater</u> motion filed at the time of sentencing would have given defendant a "meaningful opportunity to seek to vacate the plea." <u>Post</u> at ___ (slip op. at 21-22). The first is incorrect; the second, unresponsive.

As to the first, as the Appellate Division correctly noted, the PCR court's <u>Strickland</u> analysis would only "obviate[] the need for application of <u>Slater</u>" if the PCR court and the dissent had found <u>plea counsel's</u> performance deficient. They did not. Therefore, whether or not defendant would have "rejected the State's plea offer and not pled guilty had he been properly advised of the immigration consequences," <u>post</u> at ___ (slip op. at 23-24), is irrelevant to whether <u>sentencing counsel's</u> allegedly deficient performance caused prejudice. At the time of that allegedly deficient performance, defendant had already pled guilty, and he could vacate his plea only if he succeeded on a <u>Slater</u> motion.

As to the second, the dissent's "meaningful opportunity to seek to vacate the plea," <u>post</u> at ___ (slip op. at 21), is not the correct test. As the Appellate Division held, defendant could prove that sentencing counsel's performance caused prejudice only by showing a reasonable probability that competent sentencing counsel would have succeeded on a motion to withdraw his guilty

34

plea under <u>Slater</u>. A <u>Slater</u> motion is an uphill battle for any defendant. As earlier noted, it requires a court to consider: (1) whether defendant "asserted a colorable claim of innocence"; (2) the "nature and strength" of defendant's reasons for seeking to withdraw the plea; (3) whether there was a plea bargain; and (4) whether withdrawing the plea would unfairly prejudice the State or unfairly advantage defendant. <u>Slater</u>, 198 N.J. at 157-58. Defendant has not even attempted to describe how he would succeed on such a motion. Therefore, even if sentencing counsel's performance was deficient, we disagree with the dissent that defendant established prejudice pursuant to <u>Strickland</u>.

V.

We reverse the judgment of the Appellate Division and remand to the PCR court for entry of an order denying defendant's petition.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, and HOFFMAN join in JUSTICE WAINER APTER's opinion. JUSTICE NORIEGA filed a dissent, in which JUSTICE FASCIALE joins.

State of New Jersey,

Plaintiff-Appellant,

v.

Juan C. Hernandez-Peralta,

Defendant-Respondent.

JUSTICE NORIEGA, dissenting.

This appeal asks us to examine defense counsel's obligations under Padilla v. Kentucky, 559 U.S. 356 (2010), at the critical stage of sentencing. Padilla imposes an affirmative duty on counsel to advise noncitizen clients of the immigration consequences of their guilty plea when the consequence is truly succinct, clear, and straightforward. Id. at 369. That obligation cannot be discharged through the overly broad, standalone question: "Are you a U.S. citizen?" The Sixth Amendment requires more than a box-checking inquiry; it demands a reasonable investigation of the client's status.

A simple yes-or-no citizenship question, without further investigation or discussion, is constitutionally deficient for two reasons. First, it assumes the client fully understands their own immigration status and its legal significance. Second, it abdicates counsel's duty to investigate and advise where necessary.

Citizenship is not a binary switch that, once toggled, ends all further inquiry. Just as it would be ineffective for an attorney to simply ask, "Do you understand the plea?" it is equally insufficient to ask about a client's citizenship without making any further efforts to confirm that status or advise on immigration consequences. To do so is to treat <u>Padilla</u> as an administrative formality rather than a mandate for effective representation.

It is time to dispel the notion that immigration law is too obscure or intricate for criminal defense attorneys to navigate. When it comes to immigration consequences of criminal convictions, the rules are not so complex as to justify avoidance. These are not unapproachable doctrines, and they must no longer be treated as criminal law's third rail. The facts here triggered sentencing counsel's obligations under <u>Padilla</u> and <u>State v. Gaitan</u>, 209 N.J. 339 (2012), to conduct a reasonable investigation into her client's immigration status before proceeding with sentencing; she failed to do so. Her representation of defendant was deficient, and the outcome was clearly prejudicial. I must therefore respectfully dissent.

I.

A reasonable inquiry into a client's immigration status is an essential part of effective criminal representation, as it is the only way to determine whether the obligations set forth in <u>Padilla</u> are triggered. Counsel must review

2

and consider all available information in discharging this obligation. Factors such as an unverified assertion of status; inaccurate or incomplete information, even from the client; or a lack of continuity in representation do not diminish counsel's responsibilities to conduct this inquiry before proceeding with any critical stage of representation.

Before turning to why a reasonable inquiry is necessary, I first note an error in the majority's conclusion regarding defendant's deportability. Defendant was subject to removal proceedings at the moment he entered his guilty plea. That is because defendant pled to three distinct felony charges, arising from two separate indictments, which included a burglary count in each and a robbery count in one. Each count represented an independent crime capable of being established as a separate deportable offense in removal proceedings. And at the time of his plea, defendant acknowledged that in committing the burglaries, he unlawfully entered each premise with the purpose to commit a theft and, in one instance, accomplished a theft.

The Board of Immigration Appeals (BIA), which is the highest administrative body for interpreting and applying immigration laws, has historically treated burglary with intent to commit theft as a crime involving moral turpitude. In re M-, 2 I. &. N. Dec. 721, 723 (B.I.A. 1946) (explaining that whether a burglary is a crime involving moral turpitude depends on

3

whether the crime intended to be committed at the time of entry involves moral turpitude); In re L-, 6 I. & N. Dec. 666, 669 (B.I.A. 1995) (finding burglary with intent to commit theft, as defined under Massachusetts law, constituted a crime involving moral turpitude); In re Diaz-Lizarraga, 26 I. & N. Dec. 847, 852-53 (B.I.A. 2016) (considering a theft offense a crime involving moral turpitude if it involves "an intent to deprive the owner of his property either permanently or under circumstances where the owner's property rights are substantially eroded").

Defendant was therefore at risk of being placed in removal proceedings on the basis of his convictions. If defendant was a lawful permanent resident -- or had a "green card," as he told the probation officer -- then he faced removal proceedings if the Department of Homeland Security (DHS) charged him with convictions for two crimes involving moral turpitude occurring at any time after his admission to the United States.[1] 8 U.S.C. § 1227(a)(2)(A)(ii) ("Any alien who at any time after admission is convicted of

---

[1] No case exists that definitively resolves the question of whether New Jersey's burglary statute, N.J.S.A. 2C:18-2, constitutes a crime involving moral turpitude or does not; therefore, the possibility remains that DHS could charge it as such and seek removal based on that ground. The fact that a crime involving a moral turpitude determination is not categorical does not insulate the defendant from immigration consequences. Rather, it underscores the attorney's obligation to warn a defendant of the potential that DHS could charge him with removal and litigate the matter before an immigration judge.

4

two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct . . . is deportable."); In re Adetiba, 20 I. & N. Dec. 506, 512 (B.I.A. 1992) (demonstrating that two distinct offenses will each be treated as a crime involving moral turpitude even if sentenced on the same date); In re Islam, 25 I. & N. Dec. 637, 638 (B.I.A. 2011) (ruling that an individual's convictions for multiple uses of stolen credit cards on the same day in different counties and stores did not arise "out of a single scheme" and therefore constituted two or more crimes of moral turpitude as required by 8 U.S.C. § 1227(a)(2)(A)(ii)).

And although defendant had not yet been sentenced, he was "convicted" under the Immigration Nationality Act (INA), which defines a conviction as, among other things, an instance in which a defendant has "admitted sufficient facts to warrant a finding of guilt, and . . . the judge has ordered some form of punishment, penalty, or restraint on the alien's liberty to be imposed." 8 U.S.C. § 1101(a)(48)(A). Thus, appropriate advice to defendant at the time of his plea was that he was entering into a plea that included offenses that DHS could allege made him deportable.[2] Additionally, as the majority correctly

---

[2]    Our jurisprudence has described the advice attorneys must provide under Padilla to include "accurate advice for their clients on whether a guilty plea to certain crimes will render them mandatorily removable." Gaitan, 209 N.J. at

5

points out, defendant's entry into Recovery Court, a subsequent violation, and imposition of a prison sentence would also trigger an aggravated felony conviction, which would lead to a separate ground of removability.

Therefore, I disagree with the majority that those consequences were not relevant to this defendant at the time of his sentencing into Recovery Court. However, I agree with the majority that one of the consequences defendant faced by failing to comply with the requirements of Recovery Court was not only a substantial prison sentence, but also a conviction that could be charged as an aggravated felony.

---

380 (emphasis added).  The term "mandatory" appears nowhere in the INA, which does not rank deportable offenses by severity.  All offenses listed in 8 U.S.C. § 1227(a)(2) equally subject an individual to removal.

The provision states:

> Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens . . . .

> [8 U.S.C. § 1227(a).]

Thus, Gaitan's use of the concept of mandatory removability lacks textual support and offers no practical guidance for defense counsel.  To the extent that the term "mandatory" persists in the lexicon surrounding criminal cases involving immigration consequences, this Court should limit its relevance.

Nonetheless, even under the majority's review of the immigration consequences, counsel's inquiry stopped short of meeting her constitutional obligation to provide her client with effective representation.

II.

A.

The United States Supreme Court has long recognized that the Sixth Amendment right to counsel is essential to the fairness of criminal proceedings and the integrity of our adversarial system, emphasizing that this right extends to all critical stages of prosecution, including sentencing. Gideon v. Wainwright, 372 U.S. 335, 344 (1963); Mempa v. Rhay, 389 U.S. 128, 134 (1967); Missouri v. Frye, 566 U.S. 134, 140 (2012) ("Critical stages include . . . the entry of a guilty plea."); Lafler v. Cooper, 566 U.S. 156, 165 (2012) (sentencing is a critical stage in both capital and non-capital cases).

Similarly, this Court has affirmed that the right to counsel attaches at all critical stages, explicitly including sentencing, because of the substantial impact that such proceedings can have on a defendant's liberty. See State v. Hess, 207 N.J. 123, 152-53 (2011). The mere presence of counsel is not enough; those accused in criminal proceedings are guaranteed a constitutional right to "the effective assistance of counsel" in their defense. Strickland v. Washington, 466 U.S. 668, 686 (1984); State v. Fritz, 105 N.J. 42, 58 (1987)

7

(adopting the Strickland standard under Article I, Paragraph 10 of the New Jersey Constitution).

To determine whether counsel failed to provide effective assistance under our Federal and State Constitutions, we look to the test that Strickland established and this Court adopted in Fritz:  first, "defendant must demonstrate that counsel's representation was deficient" by falling below objective standards of reasonableness; and second, defendant must establish prejudice by demonstrating "a reasonable probability that the result of the proceeding would have been different but for counsel's deficiencies."  State v. Hannah, 248 N.J. 148, 180 (2021) (quoting State v. Timmendequas, 161 N.J. 515, 598 (1999)).

Significant to this matter, "[i]n representing a criminal defendant, defense counsel has a 'duty to make reasonable investigations.'"  State v. Knight, 256 N.J. 404, 418 (2024) (quoting State v. Chew, 179 N.J. 186, 217 (2004)).  Indeed, "[t]he right to a 'thorough defense investigation is also part of the right to counsel.'"  Ibid. (quoting State v. Martinez, 461 N.J. Super. 249, 276-77 (App. Div. 2019)).  That right "includes providing the defendant with the 'necessary tools, such as investigative support and expert analysis, that he needs to carry on his defense.'"  Ibid. (quoting State v. Melvins, 155 N.J. Super. 316, 320 (App. Div. 1978)).

8

B.

In Padilla v. Kentucky, Justice Stevens wrote:

> It is our responsibility under the Constitution to ensure that no criminal defendant -- whether a citizen or not -- is left to the "mercies of incompetent counsel." To satisfy this responsibility, we now hold that <u>counsel must inform her client whether his plea carries a risk of deportation.</u> Our longstanding Sixth Amendment precedents, the seriousness of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.
>
> [559 U.S. at 374 (emphasis added) (quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970)).]

By requiring that counsel inform clients whether a plea may result in deportation, the <u>Padilla</u> Court created a "two-tiered analytical structure for assessing the duty of effective assistance," which "depend[s] on the certainty of immigration consequences flowing from the plea." <u>Gaitan</u>, 209 N.J. at 356, 380.

Therefore, proper application of <u>Padilla</u> necessarily begins with two threshold determinations that must be confirmed before counsel can fulfill their Sixth Amendment obligation: first, counsel has a duty to inquire into the defendant's immigration status when there is reason to believe it may bear on the consequences of a plea or sentence; and second, if the defendant is not a

9

U.S. citizen, counsel must then assess and advise on the specific immigration consequence of a guilty plea.

This produces two different scenarios. In the first, the potential of deportation "is not succinct and straightforward," meaning a chance of deportation exists but the attorney cannot say with certainty that a guilty plea or conviction will render a defendant removable. Padilla, 559 U.S. at 369. In that scenario, an attorney discharges the Padilla duty by advising the "client that pending criminal charges may carry a risk of adverse immigration consequences." Ibid. In Padilla's second scenario, "when the deportation consequence is truly clear," an attorney has "the duty to give correct advice." Ibid.

Padilla was able to treat immigration status as a constant because the defendant was unquestionably a lawful permanent resident; therefore, the case's analysis was focused on the immigration laws that applied given his status and crimes. But attorneys and courts cannot take that clarity for granted. Defendants are often confused, uncertain, or simply mistaken about their immigration status. See, e.g., O'Riordan v. Barr, 925 F.3d 6, 9 (1st Cir. 2019) (explaining that the respondent, who was subject to removal, claimed "I came here as a child not knowing the consequences with my parents"); 8 U.S.C. § 1182(a)(6)(C)(ii)(II) (containing an express carveout shielding

children from inadmissibility charges when their false claim to citizenship was based on a reasonable but mistaken belief).

Accordingly, if "counsel must inform her client whether his plea carries a risk of deportation," Padilla, 559 U.S. at 374, then commensurate with that obligation is a duty to inquire about a defendant's immigration status, without which an attorney cannot render meaningful advice . It follows that any inquiry regarding a client's status must be conducted in a reasonable manner. See Knight, 256 N.J. at 418 (explaining that the United States and New Jersey Constitutions' guarantees of effective assistance of counsel include reasonable and thorough investigation). In other words, a simple yes-or-no question will not suffice. Instead, Padilla requires a two-prong approach: counsel must reasonably inquire as to (1) the defendant's immigration status and then (2) whether the matter at hand may trigger adverse immigration consequences.

As Padilla demonstrated, a proper response to the second prong depends on whether "the law is not succinct and straightforward" or "the deportation consequence is truly clear." 559 U.S. at 369. Padilla does not merely establish a reactive duty when immigration consequences are obvious; it also imposes a proactive duty to make a reasonable inquiry into immigration status so that counsel can fulfill the obligation to advise where appropriate. See Gaitan, 209 N.J. at 380 ("It is thus particularly important now for criminal

11

defense attorneys to be able to, at a minimum, secure accurate advice for their clients on whether a guilty plea to certain crimes will render them mandatorily removable.").

The present case, however, unsettles that which Padilla took for granted -- the clarity of a client's immigration status -- and demonstrates that the question of status requires reasonable inquiry under certain circumstances. Defense counsel cannot sidestep their obligation by relying solely on a client's potentially uninformed or incorrect response to "Are you a U.S. citizen?" Reasonable inquiry almost certainly includes asking the client about citizenship directly, but it does not end there. If the client provides information inconsistent with other facts in the record, if there is reason to doubt the client's self-report, or if some other ambiguity exists that calls into question the information provided, the Sixth Amendment requires counsel to probe further. Anything less betrays Padilla's mandate.

C.

The Padilla Court recognized a symbiotic relationship between criminal convictions and deportation and extended the duty to defense counsel to navigate that intersection competently. New Jersey law reflects that same duty. In State v. Savage, we held that defense counsel "has a duty to make reasonable investigations." 120 N.J. 594, 618 (1990) (internal quotation

12

omitted).  In <u>Chew</u>, we reiterated that failure "of the duty to make reasonable investigations" renders performance deficient.  179 N.J. at 217.  A client's lies or misunderstandings do not suspend the duty to investigate reasonably.  If anything, the duty becomes more important when the answers are less clear.

The majority is mistaken in its assessment that no such obligation has been recognized for sentencing counsel.  The constitutional obligation attaches to defense counsel, not to a particular phase of representation.  Whether designated as plea counsel, trial counsel, or sentencing counsel, an attorney representing a noncitizen bears a continuing duty to provide effective assistance, including general or specific immigration advice, depending on the clarity of the immigration consequences facing the defendant.  Fragmenting the responsibility by stage or title undermines the core principle of <u>Padilla</u>, which is to ensure that defendants receive constitutionally competent immigration advice before making critical decisions.  To allow the obligation to shift or evaporate if specific counsel should change over the course of representation would deprive defendants of meaningful protection precisely when it matters most.

Limiting counsel's <u>Padilla</u> obligation to a single procedural stage -- or reducing it merely to asking clients if they are citizens -- risks reverting to the very standard that the Court rejected in <u>Padilla</u>.  There, the Court expressly

13

declined to limit ineffective assistance claims to cases of affirmative misadvice, recognizing that such a rule "would give counsel an incentive to remain silent on matters of great importance," which the Court called an "absurd result[]." Padilla, 559 U.S. at 370. A standard that permits counsel to avoid their obligation simply by not asking further questions -- or by isolating responsibility to a narrow phase of representation -- invites precisely the kind of silence and inaction that Padilla sought to avoid.

D.

Although the State argues that a duty of reasonable investigation into immigration status would constitute an expansion of Strickland and Gaitan, its insistence that recognizing such a duty "imposes an impracticable burden on sentencing counsel that is entirely unsupported by our Constitution or caselaw" is undercut by amicus, the Association of Criminal Defense Lawyers of New Jersey (ACDL), who expressed to this Court their willingness and capacity to confront immigration-related challenges in criminal cases. Indeed, the ACDL acknowledged at oral argument that its members understand that their role requires them to engage in a process of investigation even when they represent clients who provide potentially inaccurate information. We have moved past silence as the best advice, and we must not reverse course. The Office of the Public Defender (OPD) has even designated attorneys within its ranks to focus

14

specifically on providing immigration advice, evincing that the complexities of immigration law have become manageable.[3] Mystery can no longer stand as the barrier to constitutionally competent immigration advice in criminal cases.

I also reject the State's claim that inquiring into a client's citizenship raises the specter of discriminatory conduct. Attorneys are responsible for protecting clients from penalties of which they may not be aware. Asking about citizenship status based on available indicators is not discriminatory. It is discerning. When competent counsel stands ready to engage with these issues, judicial reluctance risks denying defendants the protections <u>Padilla</u> recognized: the right to meaningful, informed representation in the face of immigration consequences.

III.

Here, one question by sentencing counsel -- "How did you become a citizen?" -- would have unearthed the critical issue in this case. Sentencing counsel instead asked for her client's Social Security number and was satisfied

---

[3] Plea counsel mentioned OPD's internal immigration specialist during the PCR hearing, asserting that had he learned of defendant's immigration status, he would have referred the matter to that colleague for an assessment.

15

with his inability to answer.[4] Her failure to ask discerning questions or to undertake any contextual analysis of her client's responses was unreasonable.

The presentence report alerted counsel that immigration advice, and therefore Padilla, was relevant to her responsibilities. Seeing the birthplace of Mexico on the presentence report, she determined that she must inquire about defendant's status. Even after confirming his answer to Question 17 on the plea form, "Are you a citizen of the United States?" was "Yes," sentencing counsel still asked defendant that same question directly. As the majority correctly points out, there was no discrepancy between the presentence report and the plea form, yet sentencing counsel thought it was necessary to ask defendant directly if he was a U.S. citizen. By posing the same question contained in the plea form, counsel merely elicited a response consistent with the form -- information she already possessed -- without confronting the material fact that had raised concern: how her client obtained legal status if he was born in Mexico.

The majority found that none of the information on which the PCR or appellate court relied -- defendant's birthplace outside of the United States, the information about his parents, and the blank fields in the presentence report --

---

[4] As the majority established, a Social Security number is not a conclusive indicium of citizenship status.

16

amounted to "clear indicia of non-citizenship." But even coupled with defendant's assertion of citizenship, that information did not serve to establish evidence of lawful status. Rather than serve as justification to end the inquiry, those gaps and flags should have prompted counsel to make further inquiry.

Moreover, despite counsel's claim that she conducted the sentencing hearing consistent with her "normal practice," the procedure she outlined does not demonstrate an example of best practices for representing a client at sentencing. For instance, counsel testified that if the presentence report investigation had properly listed defendant's current immigration status, then she would have recognized it as a "red flag, obviously." If so, then the information's absence should have been just as glaring. Counsel said it was not her custom, nor the "normal practice for most attorneys," to "rehash[] and re-go[] over all of the immigration" information at sentencing. That, said counsel, was especially true because she knew her colleague, plea counsel, had diligently explored the immigration question while negotiating the plea, and that the judge did the same when accepting the plea. But a sentencing counsel cannot discharge <u>Padilla</u> duties by incorporating the actions of a plea counsel or a judge.

The majority relies on sentencing counsel's testimony that she was not aware of defendant's previous answer to plea counsel that he was born in New

17

York, treating that as a shield against the claim of deficient performance. But it is precisely counsel's failure to properly evaluate her client's prior court appearance -- a proceeding in which she did not participate and which was critical to the overall case -- that contributed to the deficiency. The absence in the sentencing record of careful consideration of immigration consequences reflects a pro forma and cursory approach to sentencing, which is unequivocally a critical stage in the lifecycle of a criminal case.[5] At the sentencing hearing, counsel failed to correct any errors in the presentence report, but instead represented on the record that the report was accurate. Counsel treated the sentencing stage as a formality rather than a meaningful exercise of the defendant's rights.

---

[5] It is likewise concerning that it is "common place" to leave critical boxes blank, like "Other Citizenship (Nationality)," "Social Security Number," "Driver's License Number," "Residence Phone," "Emergency Phone," "Offense Date," "Alien Status," "Citizenship" (a checkbox with options for "US" and "Other"), "Other Citizenship (Nationality)," "Language," "Date Prepared," and "Date Approved," on a document meant to advise the court regarding essential details about a defendant immediately before they are sentenced to a variety of punishments, including incarceration. I would ask the Criminal Practice Committee and the Administrative Office of the Courts to review the preparation of presentence reports to assure that they are finalized in a manner that represents complete and accurate information, supported by as many corroborative documents as possible. Had the probation department simply collected and included defendant's green card, the outcome of this matter might have been entirely different.

The lack of continuity of representation in this case did not relieve sentencing counsel of her <u>Padilla</u> responsibility either. Defendants' constitutional rights do not bend to the rigors of a busy criminal defense practice. Defendants are often at the mercy of counsel who may have numerous responsibilities in a multitude of courts on any given day. Although our courts accommodate schedules and permit counsel to stand in and represent a defendant in most routine proceedings without question, that permissiveness does not relieve counsel of constitutional obligations to provide effective assistance. Meeting defendant for the first time on the day of sentencing may have required additional time to understand his background before completing a sentencing that would significantly impact his life, even setting aside the adverse immigration consequences to come.

Immigration status is a legal designation, not a label the client gets to self-apply. It is not unreasonable to conclude that a 22-year-old man, involved in the criminal justice system, on his third set of charges, facing two serious felony charges, who lives apart from his parents and who failed to complete high school, may not fully grasp the nuance of his legal status in this country. Defendant's possible confusion, as the trial court found, undoubtedly complicated counsel's task. But counsel cannot simply rely on the unsupported assertion of her unsophisticated client as justification to ignore a

19

critical issue once she identified it -- especially where clear warning signs existed. The duties to investigate reasonably and advise effectively remain, even when the path is less straightforward.

The majority correctly highlights that this dissent raises for the first time the issue of defendant's deportability at the time he entered into the plea with plea counsel at his side; this is true, but nothing in the majority suggests it is not accurate. Moreover, defendant now resides in Mexico, following his detention by Immigrations and Customs Enforcement and his removal from the United States. No party has produced any records from the removal proceedings to verify the precise grounds on which DHS relied to remove defendant, but all parties agree that he was removed and that his conviction provided the basis. His plea and convictions provided a variety of bases for DHS to seek his removal, and he was entitled to be informed of that fact prior to his conviction.

The prejudice from sentencing counsel's failure to investigate and discover her client's immigration status at sentencing is therefore concrete, not speculative. Defendant has now been deported, a consequence the Court in Padilla recognized as so severe that the Sixth Amendment requires defense counsel to advise defendants of it. Padilla does not afford defendants a means to avoid removal but simply ensures that defendants' decision to enter a guilty

20

plea is with full knowledge of such consequences. And while plea counsel did review these questions, he admitted that he did so in every case, whether they applied or not. Such a meaningless recitation of warnings without connecting them to the defendant's actual immigration status cannot suffice as appropriate advice under Padilla. The plea form is replete with questions that require an affirmative response that a defendant understands the questions, whether or not they apply to that specific defendant. Counsel is obligated to understand which apply to their client and to assure that they are meaningfully answering them. The majority relies on plea counsel's reading of the questions alone as satisfying Padilla, when neither plea counsel nor defendant believed Question 17 applied to his circumstance at the time of the plea. I do not agree with that interpretation.

Had sentencing counsel fulfilled her duty, she could have presented the issue to the trial court, clarifying that her client now stood in a materially different position than he had at the time of the plea. That information would have given the defendant a meaningful opportunity to seek to vacate the plea, had he chosen to do so pursuant to State v. Slater, 198 N.J. 145, 157-58 (2009). The majority suggests that defendant would have likely failed a Slater motion, but that conclusory analysis misses the point. Perhaps he would not have prevailed, but I have no doubt he would have made the motion given the

21

stakes.  Faced with the choice between pursuing a potentially uphill battle under the Slater balancing test[6] and accepting permanent banishment from the only country he has known since infancy, it is entirely reasonable to conclude that he would have chosen to fight.  Defendant would have had a strong basis to argue factor two:  the nature and strength of his reason for seeking to withdraw his plea -- namely, that he was never properly advised of the immigration consequences that ultimately led to his deportation.

Nonetheless, the PCR court's Strickland analysis obviates the need for application of Slater.  The PCR court found that it "would have been illogical for [defendant] to accept [Recovery] Court probation and expect to complete the same if he knew he was going to be deported."  There may not exist a solution which would have guaranteed defendant's continued residence in the United States.  The point was never to guarantee a different outcome for defendant, but to ensure that he could make an informed and knowing decision -- one fully aware of the life-altering consequences he faced.

---

[6]  It is important to note that Slater requires a balancing test rather than a conjunctive test, which means a defendant is not required to show all four factors.  198 N.J. at 162 ("Trial courts should consider and balance all of the factors discussed above in sentencing a motion for withdrawal of a plea.  No factor is mandatory; if one is missing, that does not automatically disqualify or dictate relief.").

This case presented an opportunity to make clear that an attorney's obligation under <u>Padilla</u> begins with the question:  does immigration law come into play?  That question cannot be answered through an unverified assumption or a simplistic question.  It requires inquiry.  Reasonable, yes -- but inquiry, nonetheless.  An attorney is not expected to guarantee the correct outcome but is instead obligated to make every reasonable effort to advise the defendant of the potential consequences so he can make an informed decision about how to proceed.  When the record reveals information that reasonably calls into question immigration status, the obligation does not evaporate -- it activates.  This present case is no doubt unusual.  Defendant had multiple attorneys, at one point misrepresented his place of birth, and consistently claimed U.S. citizenship.  But those complexities and ambiguities serve to heighten counsel's obligation, not diminish it.

## IV.

I would affirm but modify the appellate court judgment.  I would find, as did the PCR court, that defendant established ineffective assistance of sentencing counsel and prejudice pursuant to <u>Strickland</u>.  The PCR court also found that defendant sufficiently proved that he would have rejected the State's plea offer and not pled guilty had he been properly advised of the

immigration consequences.  Therefore, the plea should be vacated, and I would remand the matter accordingly.